Argued and submitted October 27, 1993, reversed and remanded December 14, 1994,
petition for review denied February 28, 1995 (320 Or 587)

# STATE OF OREGON,
*Appellant,*

*v.*

# ROBERT LEE TENBUSCH,
*Respondent.*

## (9112-2677; CA A76206)

886 P2d 1077

Robert M. Atkinson, Assistant Attorney General, argued the cause for appellant. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Mary M. Reese, Deputy Public Defender, argued the cause for respondent. With her on the brief was Sally L. Avera, Public Defender.

Before Deits, Presiding Judge, and Riggs and Haselton,* Judges.

DEITS, P. J.

---

* Haselton, J., *vice* Durham, J.

## DEITS, P. J.

Defendant was charged with two counts of sexual abuse in the first degree and two counts of sexual abuse in the second degree. ORS 163.425; ORS 163.415. The state appeals the trial court's order suppressing defendant's self-incriminating statements. The state argues that the trial court erred in concluding that defendant's statements were involuntary. We reverse and remand.

In an earlier case, defendant pleaded guilty to sexually abusing his stepson and was placed on probation. Two conditions of his probation were:

"9. The defendant shall engage in sexual offender treatment with a mental health professional trained and experienced in such treatment, and who is acceptable to his Probation Officer. The goals of such treatment shall be to reduce defendant's deviant sexual arousal, reduce defendant's level of denial, increase defendant's empathy for his victims, and increase the defendant's level of understanding of defendant's own functioning.

"* * * * *

"11. The defendant shall submit to polygraph examinations about his sexual history, and about his compliance with probation, whenever directed by his Probation Officer or his sexual therapist."

Defendant did not appeal from the above conditions of probation.

The pertinent facts of this case, as found by the trial court, are not in dispute:

"1) As part of the conditions of his probation, Defendant was ordered to attend and complete a course of treatment for sexual abuse. Through the probation department, Defendant was assigned to receive that treatment from Loring Cannon, as therapist.

"2) Defendant from his discussions with Cannon, understood he must complete the treatment program as prescribed by Cannon, or his probation could be revoked and he could be sent to prison. As outlined by Cannon it was a goal of the treatment program, that Defendant be honest in revealing his sexual conduct and history, and in acknowledging who were his victims.

"3)    Defendant met with Cannon on September 4, 1991 (before Defendant entered his guilty plea) and two successive weekly meetings. Cannon urged Defendant to be honest, and told Defendant if he was not more honest he would be required to take a polygraph examination. At the third meeting Cannon told Defendant to take the polygraph examination.[1] Defendant believed he was required to take the polygraph examination as directed by Cannon.

"4)    After the examination, Cannon received a report on October 26, 1991. The report indicated the Defendant was not truthful with regard to several questions. During a discussion of the report and in response to Cannon's questioning of Defendant, Defendant admitted he had abused the two female victims. More specifically, as testified by Cannon, during the discussion of the report Defendant stated he 'did it' … 'if the polygraph says I did, I did.'

"5)    During the several discussions, Cannon had advised Defendant that based upon Cannon's experience, Defendant would not go to prison if he acknowledged sexual abuse other than that for which he was convicted, although he might be prosecuted resulting in more or harsher conditions of probation. Cannon further explained to Defendant, or at least implied, that if the newly acknowledged abuse occurred after the conviction, jail or prison punishment were likely, but not if the abuse occurred before the conviction.

"6)    After the discussion about the polygraph examination, and with Defendant's consent, Cannon contacted Patty Cooper. Cooper, the social worker employed by Children's Services Division as a specialist in abuse and family conflicts, was working with the victims and Defendant's family. Cannon and Cooper arranged a meeting in mid-November 1991, for Defendant to meet with the victims and other family members.

"7)    Cannon, after discussion with Cooper, told Defendant that it would be helpful to the female victims for Defendant to admit his abuse to them. Cannon also told Defendant that Cannon would be required to inform the

---

[1] In his testimony, Cannon described several incidents in which he believed that defendant was not being honest. In each instance, the matters being discussed were directly related to the crime for which defendant was convicted. There is nothing in the record to suggest that Cannon thought defendant was being dishonest about whether he had abused his stepdaughters. Further, although Cannon warned defendant that the polygraph examination would include a question about the possible abuse of his stepdaughters, neither party asserts that Cannon requested the polygraph for the purpose of inquiring about that suspected abuse.

police authorities of Defendant's admission of the abuse of the two victims.

"8)    On November 13, 1991, Cannon, Cooper, Defendant and several persons including the female victims met at Cooper's offices. The purpose of the meeting was to coordinate treatment of the family, including Defendant. In the course of the meeting, while the two victims were present, Defendant stated "I sexually abused my [step]daughters." During the meeting there was no discussion of new criminal charges against Defendant. However, Cooper did advise Defendant that CSD was required to report his statements to the police but Defendant had the option of making the report to the police himself. Defendant said he would report to the police and did so on the same day.

"9)    Defendant went to the local police and contacted Officer Lundquist on November 13, 1991. Defendant announced to Lundquist he was there to turn himself in for molesting his two [step]daughters. He also said he was prepared to take the consequences, but during the brief discussion Defendant stated he did not recall any of the abuse. Lundquist interviewed the two female victims that day and met again with Defendant the next day.

"10)    Before the second interview began, Lundquist advised Defendant of his Miranda rights and that the conversation would be tape recorded, to which the Defendant consented and proceeded. During the second interview Defendant was comfortable and cooperative, but continued to deny recollection of details, or was evasive, but did acknowledge he had abused the two [step]daughters.

"11)    Defendant is a forty-one-year old who was on probation for the first time. He testified he believed that he must comply with the treatment directed by Cannon, that it was 'mandatory' he take the polygraph examination, that he had been directed to tell the truth, that he had told Cannon he had abused the two females, that he knew was [sic] to admit to the girls he had abused them and that he had to go tell the police. From his manner, and the consistency of his statements with other evidence presented, this Court finds that Defendant is credible in asserting that he believed he was required to admit and to report he had abused the two victims to comply with conditions of his probation and to avoid going to prison.

"12)    Defendant was under duress at the time as most sex offenders experience[,] since they are required to admit

or confront facts that they wold [*sic*] rather avoid. This Court finds however, that this duress was not so significant that it rendered the Defendant incapable of making informed choices. Although the Defendant testified he 'was confused' at the time he made the statements to Lundquist, the Court finds Defendant was properly advised of his rights before the interview."

Based on his statements, defendant was charged with two counts of sexual abuse in the first degree, ORS 163.425, and two counts of sexual abuse in the second degree, ORS 163.415. In a pre-trial motion to suppress, defendant argued that the statements made to Cannon, Cooper and Lundquist were involuntary admissions, and therefore inadmissible, under ORS 136.425(1), Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution.[2] He claimed that he was under duress to admit to the crimes because "he knew that if he did not take and pass the polygraph exam then his probation would be terminated." The trial court concluded that defendant's statements were involuntary:

"Based upon the testimony and findings above, this Court concludes that the separate admissions to Cannon, Cooper and others present, and to Lundquist, were not voluntary. * * *

"* * * From the evidence in this case this Court finds that the conditions of probation and the requirements that he submit to a polygraph did overbear the Defendant's will and impair his self-determination.

"* * * * *

"Further[,] the overbearing factors continued to be present not only in admitting to Cannon, but also at the November meeting and to Lundquist, even though Lundquist properly advised Defendant of his constitutional rights. * * *

---

[2] ORS 136.425(1) provides, in part:

"A confession or admission of a defendant, whether in the course of judicial proceedings or otherwise, cannot be given in evidence against the defendant when it was made under the influence of fear produced by threats[.]"

Article I, section 12, of the Oregon Constitution provides:

"No person shall be * * * compelled in any criminal prosecution to testify against himself."

The Fifth Amendment to the United States Constitution provides:

"No person * * * shall be compelled in any criminal case to be a witness against himself * * *."

"Although standing alone, the implication by Cannon that the Defendant would not be imprisoned for abuse which was acknowledged and which had occurred before the conviction, it was an inducement which taints the voluntary nature of the admissions. * * * Here based upon what Cannon told Defendant, it was reasonable for Defendant to conclude that if he admitted abuse which occurred prior to the conviction he would receive probation, additional treatment, rather than incarceration. This Court concludes that the implication together with the overbearing factors above, rendered his admissions involuntary."

On appeal, the state first argues that the trial court erred in concluding that defendant's statements were involuntary.[3] Defendant contends that his obligation to take the polygraph and be truthful about his sexual history, upon penalty of possible revocation of his probation, rendered his statements involuntary. He further contends that his failure to assert the privilege against self-incrimination is excused because he was placed in the "classic penalty situation" in which he was "forced to choose between making incriminating statements and jeopardizing his probation by remaining silent."[4]

■ In determining the voluntariness of defendant's statements, we are bound by the trial court's findings of historical fact that are supported by evidence in the record. *Ball v. Gladden*, 250 Or 485, 443 P2d 621 (1968). However, we are not bound by the trial court's ultimate conclusion that defendant's statements were involuntary; we assess the facts anew to determine whether they meet constitutional standards. *See State v. Stevens*, 311 Or 119, 135, 806 P2d 92 (1991).

■ Both the federal and Oregon constitutions guarantee that no person shall be compelled in any criminal prosecution to testify against himself or herself. US Const, Amend V; Or

---

[3] Although defendant refers to ORS 136.425(1), as well as state and federal constitutional provisions, as grounds for the suppression of his statements, neither party sets forth a separate statutory analysis. Rather, the parties appear to be making the same argument under the statute as they make under the constitutions. *Accordingly, for purposes of this case, our resolution of the statutory "argument" will parallel our analysis under the state constitution.*

[4] Defendant does not claim that he was entitled to *Miranda*-like warnings before being asked questions about his sexual history.

Const, Art I, § 12. The prohibitions permit a person to not answer questions in any proceeding, where the answers might incriminate the person in future criminal proceedings. *Lefkowitz v. Turley*, 414 US 70, 77, 94 S Ct 316, 38 L Ed 2d 274 (1973); *State v. Langan*, 301 Or 1, 5, 718 P2d 719 (1986). Under both provisions, a person who wishes to avoid such self-incrimination ordinarily must invoke the protection of the privilege instead of answering the posed questions. In other words, the privilege against self-incrimination is not self-executing; it is a personal privilege that must be claimed or is deemed lost. *Garner v. United States*, 424 US 648, 654 n 9, 96 S Ct 1178, 47 L Ed 2d 370 (1976); *State v. Hennessey*, 195 Or 355, 366, 245 P2d 875 (1952).

Although we generally address state constitutional arguments first, *State v. Kennedy*, 295 Or 260, 266, 666 P2d 1316 (1983), this case presents issues that have not been decided under Article I, section 12, but have been addressed by the United States Supreme Court in the context of the Fifth Amendment. *See Minnesota v. Murphy*, 465 US 420, 104 S Ct 1136, 79 L Ed 2d 409 (1984). Both parties rely on *Murphy* and argue that, because there are no Oregon decisions addressing the specific issue before us, the analysis under the Fifth Amendment is equally applicable to our analysis of Article I, section 12. Neither party suggests any reason why we should not adopt the federal standard. Thus, because the protections are similar under both constitutions, we will consider them together. *See State v. Stevens, supra*, 311 Or at 132 n 9.

In *Minnesota v. Murphy, supra*, the terms of the defendant's probation required, among other things, that he participate in a treatment program for sexual offenders and that he be truthful with his probation officer "in all matters." During his therapy, he told his therapist that he had committed a rape and murder prior to his conviction. He later confessed the same to his probation officer. The Minnesota Supreme Court suppressed the confession on the ground that its admission violated the defendant's Fifth Amendment privilege against compelled self-incrimination. 465 US at 425.

The United States Supreme Court, however, reversed the state court's decision. The Court first restated the general rule that the privilege against self-incrimination is not self-executing:

" 'The [Fifth] Amendment speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate him. If, therefore, he desires the protection of the privilege, he must claim it or he will not be considered to have been "compelled" within the meaning of the Amendment.' *United States v. Monia*, 317 US 424, 427, 63 S Ct 409, 87 L Ed 376 (1943) (footnote omitted)." 465 US at 427.

*Cf. State v. Sparklin*, 296 Or 85, 89, 672 P2d 1182 (1983) ("It is compulsion which is proscribed [by Article I, section 12]."); *State v. Hennessey, supra,* 195 Or at 365-66 (under Article I, section 12, a witness "may refuse to answer any question that would tend to incriminate him * * * [b]ut it is necessary that he claim the privilege"). The Court noted that, even in noncriminal investigations, a witness who is "under compulsion to make disclosures" must assert the privilege in a timely manner. 465 US at 428; *see United States v. Kordel*, 397 US 1, 7, 90 S Ct 763, 25 L Ed 2d 1 (1970) (corporate officer who did not assert constitutional privilege when answering interrogatories submitted by the government could not later claim that he was compelled to give testimony against himself). It concluded that a probationer under a general obligation to appear and answer questions truthfully is in no different position than a trial or grand jury witness who is subpoenaed and sworn to tell the truth upon the pain of contempt. In both situations, if the person under compulsion to answer questions makes disclosures instead of claiming the privilege, the government has not "compelled" the self-incrimination. 465 US at 427, 437. The choice to answer the questions is considered voluntary because the person was free to claim the privilege. 465 US at 428-29.

The court recognized, however, that an exception to that general rule exists in situations where the state threatens to sanction the exercise of the privilege.[5] The Court reasoned that such a threat penalizes the assertion of the privilege "so as to 'foreclos[e] a free choice to remain silent, and * * * compe[l] * * * incriminating testimony.' " 465 US at 434 (quoting *Garner v. United States, supra,* 424 US at 661).

---

[5] The Court recognized two other exceptions to the general rule that the privilege is not self-executing. 465 US at 430, 439. Those exceptions are not at issue in this case.

The Court then addressed the issue in the context of probation and stated:

"[I]f the State, either expressly or by implication, asserts that *invocation of the privilege* would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." 465 US at 435. (Emphasis supplied.)

Applying *Murphy* to the facts of this case, the state concedes that defendant's probation conditions, which required that he take the polygraph and truthfully answer questions about his sexual history upon penalty of possible probation revocation, compelled him to make disclosures. The state argues, however, that defendant, like any subpoenaed witness, was under a *lawful* compulsion to make disclosures. Thus, it argues, if defendant reasonably believed that a requested disclosure would be incriminating, it was incumbent upon him to assert the privilege rather than answer, unless he could establish that he would have suffered a penalty for invoking his right. In the state's view, because defendant neither asserted the privilege nor showed that his failure to do so was excused, the trial court erred in concluding that defendant's statements were involuntary.

Defendant, on the other hand, characterizes the conditions of his probation as "requir[ing] him to confess the sexual abuse." He relies on *Murphy* in arguing that

"the state may not condition the continuation of defendant's conditional liberty on defendant's willingness to truthfully answer questions regarding other sexual offenses he may have committed, that is, his willingness to abandon his right to silence."

Defendant appears to read *Murphy* to equate probation conditions that require a probationer to answer questions truthfully, with a probation condition that specifically precludes invocation of the probationer's protection against self-incrimination. The Court in *Murphy* said just the opposite.

In *Murphy*, the Court explained that the condition requiring the defendant to answer questions truthfully did not convert his otherwise voluntary statements into compelled ones. 465 US at 427. According to the Court, the

defendant's probation condition proscribed only false statements, and it refused to read into that condition an additional proscription against his raising legitimate objections to making statements that could be incriminating. Accordingly, the Court rejected the defendant's argument that because revocation of his probation was threatened if he was untruthful with his probation officer, he was compelled to make incriminating statements instead of claiming the privilege. 465 US at 434. The Court explained:

> "On its face, [the defendant's] probation condition proscribed only false statements; it said nothing about his freedom to decline to answer particular questions and certainly *contained no suggestion that his probation was conditional on his waiving his Fifth Amendment privilege with respect to further criminal prosecution.*" 465 US at 437. (Emphasis supplied.)

In this case, the conditions of defendant's probation require that he complete sexual offender treatment and be honest about his sexual history.[6] Although the latter condition is more specific than the condition in *Murphy*, requiring truthfulness "in all matters," the overriding focus of both conditions is on *truthfulness*. As in *Murphy*, defendant's probation is conditioned on not making false statements; thus, the conditions represent the authority of the state to revoke defendant's probation if he refuses to take the polygraph or if he answers questions untruthfully. However, the conditions neither expressly nor implicitly foreclose his right to object to making self-incriminating statements. Accordingly, the conditions of defendant's probation do not force him to choose between making incriminating statements and jeopardizing his conditional liberty. His third option, not foreclosed by those conditions, is to invoke his constitutional right against compelled self-incrimination.

We conclude that the conditions of defendant's probation do not, by their terms, constitute a threat by the state

---

[6] Although the condition of probation requires that defendant submit to polygraph examinations whenever directed by his probation officer, that requirement does no more than emphasize defendant's general obligation to be truthful. As we have previously noted, the main function of a polygraph "appears to be the added psychological factor that if the probationer fails to tell the truth, he will be detected." *State v. Age*, 38 Or App 501, 508, 590 P2d 759 (1979).

to penalize defendant for invoking the privilege against compelled self-incrimination. As noted by the state, defendant does not contend, and the trial court did not find, that defendant was ever told or led to believe that his probation could be revoked if he exercised the privilege. Under the rule articulated in *Murphy*, the threatened penalty must be specifically addressed to the *exercise of the privilege against self-incrimination* for defendant to claim that he was compelled to speak. Because no such threat was made in this case, defendant's failure to exercise the privilege in a timely manner precludes him from now claiming that his answers were compelled in violation of Article I, section 12, and the Fifth Amendment.

The state next argues that the trial court erred when it held that Cannon's implied promise, that defendant would not be imprisoned if he admitted to additional crimes, "was an inducement which taints the voluntary nature of the admissions." The state contends that Cannon's statements do not rise to the level of an implied promise and that, even if they do, the evidence does not support a finding that defendant's statements were induced by that promise.

■ ■ Under Oregon law, a confession or admission is involuntary, and thus inadmissible, if it is induced by a direct or implied promise of leniency. *State v. Ely*, 237 Or 329, 335, 390 P2d 348 (1964). Assuming, without deciding, that Cannon did make an implied promise of leniency to defendant, we conclude that the record does not support a finding that defendant was induced by Cannon's promise to make the incriminating statements. In his motion to suppress, at the hearing before the trial court and in his brief and argument to this court, defendant himself has repeatedly and consistently asserted that he was *compelled* to make the incriminating statements by his probation conditions. He argued that the conditions were so coercive as to preclude him from asserting his constitutional rights against compelled self-incrimination; that he was "forced to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent." The trial court specifically found defendant "credible in asserting that he believed he was required to admit and to report he had abused the two victims

to comply with conditions of his probation and to avoid going to prison."

Although we recognize that defendant is entitled to make alternative *legal* arguments, the success of his "implied promise" argument depends upon a finding that defendant might not have made the incriminating statements without the inducement of the implied promise.[7] Such a finding is inconsistent with most of his testimony and with the trial court's express credibility determination. We conclude that the evidence does not support defendant's argument that he was induced to make incriminating statements by an implied promise of leniency. We hold that the trial court erred in granting defendant's motion to suppress.

Reversed and remanded.

---

[7] Defendant testified that he did not believe that his statements about abusing his stepdaughters would be used against him in a criminal action:

"[Defense counsel]: And would you have made those statements if you had known that they could be used against you?

"[Defendant]: Not without speaking to an attorney first."