Argued and submitted December 30, 2010, reversed February 16, 2011

David REDWINE,
dba David Redwine/Pension Plan;
and Laurie Turner-Redwine,
*Plaintiffs-Respondents,*

*v.*

STARBOARD, LLC,
an Oregon limited liability company,
*Defendant,*

*and*

Tamara SAWYER,
*Appellant.*

Deschutes County Circuit Court
08CV0397ST; A143771

251 P3d 192

Marc D. Blackman argued the cause for appellant. With him on the briefs were Kendra M. Matthews and Ransom Blackman LLP.

Michael H. McGean argued the cause for respondents. With him on the brief were Martin E. Hansen and Francis Hansen & Martin, LLP.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Duncan, Judge.

HASELTON, P. J.

**HASELTON, P. J.**

Appellant Tamara Sawyer (Sawyer)[1] challenges a judgment of summary contempt, ORS 33.096, based on her refusal to produce documents and answer certain questions in a judgment debtor examination arising from a money judgment that plaintiffs secured against the defendant corporation, Starboard, LLC. She argues, in part, that the trial court erred in directing her to answer those questions and produce documents, and in imposing sanctions, notwithstanding her invocation of the privilege against self-incrimination pursuant to Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution. As amplified below, we conclude that the trial court erred in determining that Sawyer was not entitled to invoke the privilege and, consequently, in imposing contempt sanctions for her refusal to comply with its directives. Accordingly, we reverse.

The relevant facts are undisputed. In May 2008, plaintiffs filed a lawsuit against Starboard, seeking payment on several delinquent promissory notes. In March 2009, plaintiffs obtained a judgment against Starboard for over $900,000, including interest and attorney fees. After the judgment was entered, Tamara and Kevin Sawyer were ordered to appear for a judgment debtor examination, ORS 18.265(1), and to produce certain documents pertaining to Starboard's property and its financial affairs.[2] Previously,

---

[1] As recounted below, Tamara Sawyer's husband, Kevin Sawyer, was also adjudged to be in contempt, but he has not appealed from that judgment. Accordingly, all references to "Sawyer" are to Tamara Sawyer.

[2] The trial court's order and citation directing Tamara Sawyer to appear, testify, and produce documents at the debtor examination were directed at her personally, not to Starboard. The trial court's "ORDER FOR JUDGMENT DEBTOR EXAMINATION" provided, in material part, "IT IS HEREBY ORDERED that Tamara Sawyer * * * appear * * * to answer under oath concerning any property or interest in any property claimed or held by the following individuals and entities [a list of various corporate entities] * * * and then and there to produce the following documents pertaining to the above-mentioned entities and individuals [followed by a list of documents]."

In similar fashion, the citation to the debtor examination was directed to the Sawyers individually, and not to Starboard or its representative. The Sawyers were also subpoenaed, in their individual capacities, to appear for depositions and to produce documents at the debtor examination.

The order, citation, and subpoenas *duces tecum* directed the Sawyers to produce the following Starboard records:

Tamara Sawyer had made public statements as to her and her husband's involvement with Starboard's assets and its business dealings.

At the time the judgment debtor examination was to be held, published reports indicated that the Sawyers and Starboard were the subjects of a criminal investigation by the FBI and that Starboard was under investigation by the IRS. Indeed, it is undisputed for the purposes of our review that Tamara Sawyer was, in fact, a "target" of a continuing federal criminal investigation involving, *inter alia*, Starboard.

The debtor examination, held May 18, 2009, was attended by the Sawyers and counsel for Starboard. The Sawyers, invoking the privilege against self-incrimination, refused to answer plaintiffs' questions or produce any documents, whereupon plaintiffs initiated contempt proceedings against them seeking "remedial" sanctions.[3]

The first contempt hearing was held on August 6, 2009. At that hearing, the Sawyers again stated their intention to invoke the privilege against self-incrimination as to plaintiffs' questions and requests for the production of documents. The trial court determined that the best course of

---

"1. Any and all documents concerning real property, including but not limited to, deeds to any real property, all property tax records, and records of all transfers of real property during the last three (3) years;

"2. Certificates of title to any motor vehicles, including recreational vehicles, mobile homes, and boats or other watercraft;

"3. All records concerning any transfer of real or personal property over $2,500 during the last three (3) years;

"4. Stock certificates evidencing ownership in any corporation or other business entity;

"5. Information concerning all bank accounts, investment accounts, brokerage accounts, and money market accounts, including all account statements, check registers, balance sheets, journal logs, deposit slips, and cancelled checks;

"6. All promissory note and loan documents, including records of all monies loaned or borrowed during the last three (3) years;

"7. All records of any accounts receivable;

"8. All information concerning last year's state and federal income tax returns."

[3] A "remedial" sanction for contempt "means a sanction imposed to terminate a continuing contempt of court or to compensate for injury, damage or costs resulting from a past or continuing contempt of court." ORS 33.015(4). The procedures for imposing a remedial contempt sanction are set out in ORS 33.055.

action was to continue the hearing so that it could preside over the debtor examination and rule on the Sawyers' invocations of the privilege on a "question-by-question basis." *See Empire Wholesale Lumber Co. v. Meyers,* 192 Or App 221, 226, 85 P3d 339 (2004) (privilege "must be invoked, and ruled upon, on a question-by-question, document-by-document basis"). Accordingly, the trial court continued the contempt proceedings to October 5, 2009.

At the October 5 hearing, plaintiffs, Kevin Sawyer, and Tamara Sawyer—who was represented by counsel—appeared. No person appeared for Starboard, and Starboard was not represented by counsel. Kevin Sawyer was first sworn and called to testify. Plaintiffs asked Kevin Sawyer about his "position past or present with Starboard," and he invoked the privilege under Article I, section 12, and the Fifth Amendment. Tamara Sawyer's counsel contended that Kevin Sawyer's invocation of the privilege was proper because answering plaintiffs' question

> "would be potentially subjecting him to disclosure of information that could be used against him in the pending criminal investigation because Starboard * * * we've * * * read in the newspaper is a focus of this criminal investigation. So obviously, an officer or director of, of a company could be, that answer could be used against them."

The trial court, reasoning that, because Kevin Sawyer's status with respect to Starboard "should be a public record, and so it's discoverable [in] * * * other ways," ruled that the privilege did not apply and held Kevin Sawyer in contempt for not answering.

Plaintiffs then asked Kevin Sawyer, "[W]hich of [the requested] documents have you produced today?" and Kevin Sawyer again invoked the privilege. The trial court, after hearing further argument as to what sanction for contempt against Kevin Sawyer should be imposed, took the matter under advisement.[4]

---

[4] The trial court did not at that time expressly rule on whether it was holding Kevin Sawyer in contempt for his refusal to answer the question concerning whether he had produced the documents. However, later, in its final order, the trial court stated that it was holding Kevin Sawyer in contempt for his "refusal[ ] to answer questions or produce documents."

Tamara Sawyer was next placed under oath, and plaintiffs asked the following question:

"[W]hat has been *your past and your present* connection with Starboard LLC?"

(Emphasis added.) Sawyer refused to answer, invoking the privilege under Article I, section 12, and the Fifth Amendment. Plaintiffs' counsel asserted that "[t]he Fifth Amendment does not apply to that broad a question." Sawyer's counsel, renewing the contentions that had been expressed with respect to Kevin Sawyer, remonstrated:

"The fact that something may be discoverable through an independent source such as the public record does not affect the validity of the privilege assertion on the part of the witness.

"So I respectfully disagree with the Court's analysis with respect to the, whether she is required to answer questions about whether she holds a position with Starboard. I believe she does in fact have a good-faith basis to believe that an answer to that question could be used against her in the ongoing criminal investigation and criminal proceedings and, therefore, it's her privilege which I would urge the Court to honor."

The trial court then asked Sawyer's counsel to explain why an answer to that question was potentially incriminating, and counsel responded:

"Starboard is, by published report, the subject of allegations of a criminal nature with respect to the management of funds and other things. The acknowledgement by someone that they are in a position of responsibility in that company, irrespective of whether it could be proved some other way, demonstrates knowledge and an admission on their part that could be used to establish their responsibility for the conduct of the entity.

"With the, say, public record, someone could attempt to persuade a jury, for example, that the person holds that position and is responsible, but they don't have the admission by the person that they hold the position. And that's very different."

The trial court, apparently rejecting that reasoning, advised Sawyer that her answer was not privileged and ordered her to respond. Again, she declined to do so.

Plaintiffs then asked Sawyer whether she had "brought any of [the] * * * documents today as ordered" by their subpoena and the court's citation to the debtor examination. Sawyer again invoked the state and federal privileges against self-incrimination, whereupon the following colloquy ensued:

"[Sawyer's counsel]: The act of production privilege, Your Honor, the personal interests of a person can involve not merely the substantive answer, but also whether or not they're knowledgeable about the existence of records from which can be inferred a knowledge of the contents. Therefore, a person who has a reason to believe that they are under criminal investigation has a right to decline as a constitutional matter both state and federal, the request to produce documents, because the act of production may tend to incriminate them.

"THE COURT:  And you believe the case law supports your theory of that?

"[Sawyer's counsel]:  Absolutely. The act of production privilege has been well-documented and recognized by the United States Supreme Court. * * *

"* * * * *

"[PLAINTIFFS' COUNSEL]:  Your Honor, this, again the record is clear already, we can belabor this for hours, but it's very apparent that the, both defendants, * * * Kevin Sawyer, Tammy Sawyer, and the defendant Starboard [are] subject to this Court's order, both prior to today and then in the presence of the Court in open defiance of this Court's order, have refused to answer even the most general of questions, improperly hiding behind the Fifth Amendment.

"And this Court indulged them to the point of having this hearing so you could piecemeal take up valid objections, not global 'I'm not going to answer anything, I won't bring anything' objection * * *.

"* * * I can't conduct a debtor's exam as ordered by this Court with no documents and no answers."

The trial court issued the following ruling from the bench at the conclusion of the October 5 hearing:

> "I am holding [Tamara Sawyer] in contempt as well in her capacity [*sic*]. You know, one would argue that they're here both individually as well as with regard to their capacity with Starboard.
>
> "They are, the Court is finding that both of them are in contempt with regard to the questions that were answered, and * * * they've insisted that the Fifth Amendment applies."

The court once again continued the hearing—to October 30—to entertain arguments from the parties as to what sanctions to impose.

On October 30, the trial court reiterated its determination that the Sawyers were both in summary contempt. The court ordered both Sawyers to relinquish their passports and Tamara Sawyer to report to custody on November 6, 2009. Thereafter, the court issued a judgment, entered November 5, 2009, in which it stated that it had found Tamara Sawyer to be in summary contempt.[5] Sawyer filed a notice of appeal from that judgment the same day.[6]

■      On appeal, Sawyer raises five assignments of error. In her first two assignments of error, Sawyer challenges the trial court's rulings that she must respond to the plaintiffs' questions as to her connection to Starboard and for the production of documents over her assertion of the privilege against self-incrimination. Sawyer's third, fourth, and fifth assignments of error pertain to the procedural propriety of the trial court's imposition of summary contempt, *see* ORS 33.096, and the sanction it imposed.

---

[5] Neither the judgment, nor the written order memorializing the court's October 30 rulings, on which the judgment is predicated, refer to Starboard or to Sawyer in representative—as opposed to her individual—capacity.

[6] On November 5, in anticipation of filing her notice of appeal, Sawyer moved the trial court to stay the sanction of incarceration (which was to begin November 6) pending appeal. A hearing on that motion was held on November 6, 2009, and the trial court denied her request. Sawyer immediately renewed her motion before this court, pursuant to ORAP 7.35, and the court granted a temporary stay of seven days, which was subsequently extended to remain in effect pending disposition of this appeal. *See* ORS 19.350.

With respect to whether Sawyer properly invoked the privilege against self-incrimination, the parties generally reprise and refine the arguments they made before the trial court. In particular, Sawyer contends that the trial court "employed incorrect standards under both the Oregon and federal constitutions in rejecting [Sawyer's] assertion of privilege." Plaintiffs respond, in essence, that Sawyer failed to establish that her fear of incrimination was reasonable under the circumstances because plaintiffs' questions did not elicit incriminating information. Rather, plaintiffs maintain, Sawyer's "refusal to follow the court's order was * * * motivated [solely] to prevent plaintiffs from conducting a debtor's examination * * * concerning Starboard's assets." We conclude, for the reasons that follow, that the trial court erred in its determination that Sawyer's invocation of the privilege was unavailing. Accordingly, we reverse on that basis and do not address the other, alternative, assignments of error.

Before turning to the merits, we clarify our standard of review. Here, the operative facts are uncontroverted. Specifically, the parties do not dispute either that Sawyer willfully violated the court's order to testify or that, at the time that she refused to comply with the court's directives, she was, in fact, the "target" of a federal criminal investigation pertaining, in part, to Starboard. Rather, the dispute centers on whether the trial court erred in overriding Sawyer's invocation of the privilege against self-incrimination. We review the trial court's conclusion as to the applicability of a privilege in this context for errors of law. *See State v. Langley*, 314 Or 247, 263, 839 P2d 692 (1992), *adh'd to on recons*, 318 Or 28, 861 P2d 1012 (1993) (reviewing, for errors of law, the trial court's determination that the psychotherapist-patient privilege did not apply).[7]

---

[7] In *Empire Wholesale Lumber Co.*, we stated, without textual elaboration, that "[t]he determination of the availability of the privilege is *committed to the discretion* of the trial court." 192 Or App at 226 (emphasis added). As support for that statement, we referred to *Rogers v. United States*, 340 US 367, 374, 71 S Ct 438, 95 L Ed 344 (1951), and *U.S. v. Boothe*, 335 F3d 522, 525 (6th Cir 2003), *cert den*, 541 US 975 (2004). Upon close examination, the reference to "discretion" in those and related cases appears to relate to the prudential deference to be accorded a trial court's determination in circumstances in which the witness's susceptibility to inculpatory consequences is uncertain or ambiguous. Where, however, it is uncontroverted that the party invoking the privilege is, in fact, the subject of a criminal

Although Sawyer invoked the privilege under Article I, section 12, as well as the Fifth Amendment, both parties have conflated their analyses of the two constitutional provisions, with neither proposing a distinct analysis under Article I, section 12, or arguing against our adoption of the federal standard. Indeed, in material respects, much of the parties' briefing focuses on cases construing the privilege's application under the Fifth Amendment. Accordingly, although we typically consider arguments raised under the Oregon Constitution before considering those raised under federal constitution, *State v. Kennedy*, 295 Or 260, 262-68, 666 P2d 1316 (1983) (describing methodology), we will focus on the privilege as it applies under the Fifth Amendment. *See Dept. of Human Services v. K. L. R.*, 235 Or App 1, 5, 230 P3d 49 (2010) (choosing to analyze privilege only under the Fifth Amendment where the appellant did not "develop[ ] a separate analysis under the Oregon Constitution"). *But cf. State v. Tenbusch*, 131 Or App 634, 641, 886 P2d 1077 (1994), *rev den*, 320 Or 587, *cert den*, 516 US 991 (1995) (analyzing the Oregon and federal constitutional privileges together "because the protections are similar").

■ ■ The Fifth Amendment provides that "[n]o person shall be * * * compelled in any criminal case to be a witness against himself." That privilege protects a person from being compelled to testify in any proceeding—including civil proceedings—when the answers may incriminate the person in a future criminal prosecution. *See, e.g., Maness v. Meyers*, 419 US 449, 464, 95 S Ct 584, 42 L Ed 2d 574 (1975) (reaffirming the principle, in the context of a civil case, that "the privilege against self-incrimination can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory" (internal quotation marks omitted)). The privilege pertains not only to inquiries that would be directly incriminating, but also "embraces those which would furnish a link in the chain of evidence" needed

---

investigation or prosecution pertaining to the subject matter of the inquiry and the inculpatory potential of the inquiry is manifest, "discretion" is inapposite. *See State v. Rogers*, 330 Or 282, 312, 4 P3d 1261 (2000) ("[I]n the context of evidentiary rulings, 'discretion,' as this court has used that term, refers to the authority of a trial court to choose among several legally correct outcomes. If there is only one legally correct outcome, then 'discretion' is an inapplicable concept.").

to prosecute a crime. *Hoffman v. United States*, 341 US 479, 486, 71 S Ct 814, 95 L Ed 1118 (1951). Thus, as we have previously explained:

> "A person's assertion of the Fifth Amendment privilege does not depend on the court's assessment of the likelihood of prosecution. *United States v. Miranti*, 253 F2d 135, 139 (2d Cir 1958). Nor does it depend on whether a criminal prosecution is pending. *United States v. Rendahl*, 746 F2d 553, 556 (9th Cir 1984). 'Once the court determines that the answers requested would tend to incriminate the witness, it should not attempt to speculate whether the witness will in fact be prosecuted.' *United States v. Jones*, 703 F2d 473, 478 (10th Cir 1983); *accord Miranti*, 253 F2d at 138-39. The appropriate inquiry is whether the testimony in question would provide evidence of a particular crime. *United States v. Edgerton*, 734 F2d 913, 921 (2d Cir 1984)."

*Empire Wholesale Lumber Co.*, 192 Or App at 226-27.

■ In determining whether the privilege applies, the trial court must evaluate, with respect to each question for which the privilege is claimed, whether "the answer to that particular question would subject the witness to a real danger of * * * crimination," as opposed to "a mere imaginary possibility of increasing the danger of prosecution." *Rogers v. United States*, 340 US 367, 374-75, 71 S Ct 438, 95 L Ed 344 (1951) (internal quotation marks omitted). *See also Marchetti v. United States*, 390 US 39, 53, 88 S Ct 697, 19 L Ed 2d 889 (1968) (stating the standard as "whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination").

■■ In making that assessment, the witness must not be "required to prove the hazard in the sense in which a claim is usually required to be established in court," lest the witness "surrender the very protection which the privilege is designed to guarantee." *Hoffman*, 341 US at 486. Accordingly,

> "[t]o sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered *might be dangerous because injurious disclosure could result.*"

*Id.* at 486-87 (emphasis added). Although the witness claiming the privilege bears the burden of establishing that an answer could be injurious, the court must construe the privilege liberally "in favor of the right it was intended to secure." *Id.* at 486. Thus, it must be *"perfectly clear,* from a careful consideration of all the circumstances in the case, that the witness [claiming the privilege] is mistaken, and that the answers *cannot possibly* have such tendency to incriminate." *Id.* at 488 (internal quotation marks and brackets omitted; emphasis in original).

■    Further, the protections afforded by the privilege are not abrogated merely because the government may have access from another source to the same information sought to be compelled from the witness. That is so for at least two reasons. First, as a practical matter, such an exception would substantially subvert—and perhaps abrogate—the constitutional protection.[8] Second, evidence compelled from "the speaker's own mouth" can convey inculpatory implications that are uniquely, qualitatively different than those attending other evidence. *See, e.g., Grunewald v. United States,* 353 US 391, 421-22, 77 S Ct 963, 1 L Ed 2d 931 (1957) (witness was justified in invoking privilege in grand jury proceedings, despite decision to testify at trial, based on legitimate concern that he "would have provided the Government with incriminating evidence from his own mouth").

■    Finally, the privilege can also extend to protect against the act of production in circumstances where the production of documents has a "protected testimonial aspect[ ]," *United States v. Hubbell,* 530 US 27, 36 n 19, 120 S Ct 2037, 147 L Ed 2d 24 (2000) (internal quotation marks omitted), *viz.,* the act "explicitly or implicitly * * * relate[s] a factual assertion or disclose[s] information." *Doe v. United States,* 487 US 201, 210, 108 S Ct 2341, 101 L Ed 2d 184 (1988). The act of production may communicate such statements of fact, where, for example, "[b]y producing documents in compliance

---

[8] For example, as Sawyer's counsel posited during oral argument on appeal, if such an exception applied, then any time a suspect made incriminating statements to a police officer, there would be nothing to preclude the government from calling the defendant as a witness as to those incriminating facts during his or her criminal trial and compelling a reiteration of the statements from the defendant's own mouth.

with a subpoena, the witness would admit that the papers existed, were in his possession or control, and were authentic." *Hubbell*, 530 US at 36 (internal quotation marks omitted).

With those principles in mind, we return to the specific circumstances and questions posed to Sawyer in this case. Here, the potential for self-incrimination was patent. At the time Sawyer invoked the privilege against self-incrimination, published reports indicated that she was under federal investigation for conduct relating to the financial affairs and business dealings of Starboard—and, as noted, it is undisputed that she was, in fact, the target of a pending federal criminal investigation. The information sought by the creditors in this case—indeed as evinced by plaintiffs' express focus in the debtor examination—was calculated to explore and expose precisely the nature and contours of Sawyer's relationship to Starboard and its (potentially criminally inculpatory) financial affairs.

In that context, it was not "perfectly clear," *Hoffman*, 341 US at 488 (emphasis omitted), that a responsive answer to plaintiffs' initial, "broad" question to Sawyer—*viz.*, "what has been *your past and your present* connection with Starboard LLC?" (emphasis added)—"[could not] possibly have [a] tendency to incriminate" or that "injurious disclosure" would not result. *See Hoffman*, 341 US at 487-88 (internal quotation marks and emphasis omitted). By answering that question, Sawyer risked disclosing the nature, duration, and degree of her involvement with and authority (if any) over the affairs of Starboard—evidence that might well be used in a future criminal proceeding to establish her responsibility for the activities that were under investigation by the FBI and the IRS. Although some of that same information may have been available from other sources, including public records or Sawyer's own public statements months before, at the very least, some aspects of a responsive answer to that question would have necessarily disclosed potentially inculpatory information that was only available from Sawyer herself.

We reach the same result as to plaintiffs' question as to whether Sawyer, in her personal capacity, had "brought

any of [the] * * * [Starboard] documents today as ordered" by their subpoena and the court's citation to the debtor examination. That request essentially called on Sawyer to "explicitly or implicitly * * * relate a factual assertion or disclose information," as to the existence of the documents, her knowledge or possession of them, her belief that the records were those described in the subpoena, and, conceivably, their authenticity. *See Doe*, 487 US at 210. In light of the totality of the uncontroverted circumstances of this case, there was a "substantial," *Marchetti*, 390 US at 53, and "real danger," *Rogers*, 340 US at 374 (internal quotation marks omitted), that such testimonial assertions could be used to "furnish a link in the chain of evidence needed to prosecute * * * [a] crime," *Hoffman*, 341 US at 486.

In the end, we, like the trial court, appreciate that plaintiffs have a real and valid interest in executing their judgment against Starboard. Nor are we unmindful of their frustrations in being constrained in that effect, at least so long as Sawyer's purported criminal involvement with Starboard remains unresolved. Nevertheless, so long as that proximate exposure to criminal liability remains, Sawyer's invocation of the privilege against self-incrimination as to the inquiries at issue here cannot be contravened. Accordingly, the trial court erred in adjudging Sawyer in contempt.

Reversed.