No. 35          January 28, 2026          641

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of W. E. B.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

S. L. B.,
*Appellant.*

Klamath County Circuit Court
24JU05942; A187882 (Control)

In the Matter of D. J. B.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

S. L. B.,
*Appellant.*

Klamath County Circuit Court
24JU05944; A187883

In the Matter of K. B.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

S. L. B.,
*Appellant.*

Klamath County Circuit Court
24JU05943; A187884

Stephen R. Hedlund, Judge.

Submitted November 20, 2025.

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Elena C. Stross, Deputy Public Defender,

Oregon Public Defense Commission, filed the brief for appellant.

Daniel Rayfield, Attorney General, Benjamin Gutman, Solicitor General, and Carson L. Whitehead, Assistant Attorney General, filed the brief for respondent.

Before Aoyagi, Presiding Judge, Egan, Judge, and Pagán, Judge.

AOYAGI, P. J.

Affirmed.

**AOYAGI, P. J.**

Father appeals from juvenile court judgments establishing dependency jurisdiction over his three children, D, K, and W, and relieving the Oregon Department of Human Services (ODHS) of its obligation to make reasonable efforts to reunify the family. During father's testimony at the jurisdictional hearing, father's counsel objected to questions about baby M, who allegedly died by neglect while in parents' care, citing father's right against self-incrimination under the Fifth Amendment to the United States Constitution. The trial court overruled the objection and ordered father to answer. After father answered four questions about M, his counsel renewed the objection, and the court sustained the renewed objection. On appeal, as to each child, father assigns error to the juvenile court compelling him to testify without immunity, and he seeks reversal of the dependency judgments. For the reasons explained below, we affirm.

### FACTS

The relevant facts are undisputed. Mother is not a party on appeal, so we limit our discussion to facts relevant to father and father's appeal.

ODHS received information to the effect that mother had given birth to baby M in July 2024, that the birth took place in a tent on parents' property, that parents failed to obtain necessary medical care for M, and that M died in October 2024 and was buried on parents' property. That information led to ODHS removing D, K, and W from parents' care. Parents were arrested for criminal mistreatment of D, K, and W the same day as the removal. A police search for M's remains was unsuccessful.

In December 2024, ODHS filed petitions to establish dependency jurisdiction over D, K, and W, alleging five jurisdictional bases as to father. ODHS filed amended petitions in January 2025, adding a new jurisdictional allegation that "father, by abuse or neglect, caused the death of a child." ODHS requested in the amended petitions that it be relieved of its obligation to make reasonable efforts to reunify the family, based on that aggravating circumstance. *See* ORS 419B.340(5)(a)(A) (allowing the juvenile court to

relieve ODHS of making "reasonable efforts to make it possible for the ward to safely return home" in certain "aggravated" circumstances, including when "[t]he parent by abuse or neglect has caused the death of any child").

In April 2025, the court held a hearing on ODHS's jurisdictional allegations as to father. By that time, the pending criminal-mistreatment charges relating to D, K, and W had been resolved, with father pleading guilty to two counts. Father stipulated to the five original jurisdictional allegations, which pertained to father failing to provide medical and dental care to the children, the criminal mistreatment charges, father lacking parenting skills and not understanding the children's needs, father failing to maintain a safe environment for the children, and father being unavailable as a custodial resource due to incarceration. The only jurisdictional allegation that father contested was the one regarding M's death.

Father testified at the hearing. On cross-examination, children's counsel asked him who had been "responsible for parenting [M]." Father's counsel objected that father had a "Fifth Amendment right to remain silent." The court overruled the objection, reasoning that the question was not "as damning" as counsel was suggesting, and it ordered father to answer the question. Father answered that the baby was stillborn so there was "no way to care for it." Children's counsel asked where M was born, and father testified that M was born on parents' property but that he would not say that M was "born" because he was stillborn. Children's counsel asked whether M was delivered by a doctor, and father testified that he assisted mother in delivering the baby at home. Children's counsel asked whether father had "attempt[ed] to get assistance or call[ed] for help" after the birth. Father answered that he did not want the children to see a dead baby, so he buried the body, and he did not know why the detectives could not find the remains. Father's counsel renewed his prior Fifth Amendment objection, and the court sustained the objection at that point. Father did not move to strike his answers to the last four questions or seek other relief regarding the testimony already given, nor did the juvenile court take any action relating to the testimony already given.

Three other witnesses gave testimony regarding M. A detective with the sheriff's department testified that father initially told him that M was stillborn but later told him that M lived for a time, and also that father told him that M was buried on parents' property. D, aged 10, testified that he remembered holding M and helping bottle-feed M, that father told him that M died from dehydration, and that M was buried by the pig pen. An ODHS protective services worker testified to things that father told her about various events in the months following M's birth that involved M being alive.

At the conclusion of the hearing, the juvenile court asserted dependency jurisdiction over D, K, and W. The court asserted jurisdiction on the five bases to which father had stipulated. It also asserted jurisdiction based on father having caused the death of another child (M) by neglect, and it relieved ODHS of its obligation to make reasonable efforts to reunify the family given that aggravating circumstance. In doing so, the court expressly discredited father's in-court testimony that M was stillborn and relied on other evidence to find that M was born alive and died due to neglect.

## ANALYSIS

The Fifth Amendment to the United States Constitution provides that "[n]o person *** shall be compelled in any criminal case to be a witness against himself." Importantly, "[t]he privilege can be claimed in any type of proceeding, but it protects a person from self-incrimination only in criminal prosecutions." *Dept. of Human Services v. K. L. R.*, 235 Or App 1, 5, 230 P3d 49 (2010). "In assessing a person's claim of privilege, the trial court's role is to determine whether there is a risk of incrimination, and the privilege must be sustained unless it is '*perfectly clear*, from a careful consideration of all the circumstances in the case, *** that the answer *cannot possibly* have such tendency to incriminate.'" *State v. Rodriguez*, 301 Or App 404, 414, 456 P3d 312 (2019) (quoting *Hoffman v. United States*, 341 US 479, 488, 71 S Ct 814, 95 L Ed 1118 (1951) (emphases in *Hoffman*; ellipsis and brackets in *Rodriquez*)). "The appropriate inquiry is whether the testimony in question would provide evidence of a particular crime." *Empire Wholesale*

*Lumber Co. v. Meyers*, 192 Or App 221, 227, 85 P3d 339 (2004).

A way to respect the Fifth Amendment privilege while still compelling testimony in a noncriminal proceeding is to grant use and derivative-use immunity. When a witness is granted such immunity, the "prosecutorial authorities" are prohibited "from using the compelled testimony in any respect," which "[e]nsures that the testimony cannot lead to the infliction of criminal penalties on the witness." *Kastigar v. United States*, 406 US 441, 453, 92 S Ct 1653, 32 L Ed 2d 212 (1972). Granting "use and derivative-use immunity is constitutionally sufficient to compel testimony over a claim of the privilege." *Id*. at 458; *see also K. L. R.*, 235 Or App at 10 ("[P]roviding use immunity from criminal prosecution is a necessary condition to compelling potentially incriminating statements as an inducement for full cooperation and disclosure during dependency proceedings.").[1]

We review for legal error a trial court's decision to compel testimony in the face of a Fifth Amendment invocation. *Rodriguez*, 301 Or App at 410.

In this case, father assigns error to the juvenile court "compelling father to provide testimony that could be used against him in a criminal prosecution, and without granting father any type of immunity in exchange for his testimony." Father's appellate arguments reference both the Fifth Amendment and Article I, section 12, of the Oregon Constitution, but we agree with the state that father invoking his "Fifth Amendment right to remain silent" was insufficient to preserve a state constitutional issue. We therefore limit our discussion to the Fifth Amendment. We also note that, although father appears to request a full reversal of the jurisdictional judgments, any remedy would be limited to reversing the contested jurisdictional basis—that father, by abuse or neglect, caused M's death—and the related order relieving ODHS of its obligation to make reasonable efforts

---

[1] We emphasize that we are discussing the Fifth Amendment. The Oregon Supreme Court has adopted stricter immunity requirements to protect the state constitutional right against self-incrimination in Article I, section 12, of the Oregon Constitution. *See Dept. of Human Services v. F. T. R.*, 306 Or App 697, 703-04, 475 P3d 931 (2020) (contrasting federal and Oregon constitutional law on this point).

to reunify the family. Father stipulated to five other jurisdictional bases, before he testified, so a full reversal would not be available.

Turning to the merits, ODHS does not fully concede that the juvenile court erred in ordering father to answer the four questions about M. However, it "acknowledges that the juvenile court likely erred under the Fifth Amendment," at least as to the first question,[2] and, rather than defend the ruling, focuses on harmlessness. ODHS argues that the "error was an evidentiary one, and, on this record, was harmless beyond a reasonable doubt."

We assume *arguendo* for present purposes that the juvenile court erred in ordering father to answer the four questions. The assumed error is evidentiary in nature, as the state notes and father does not dispute. An actual Fifth Amendment violation would not occur until and unless father's compelled testimony was used against him in a criminal case. *See Chavez v. Martinez*, 538 US 760, 767, 123 S Ct 1994, 155 L Ed 2d 984 (2003) ("Statements compelled by police interrogations of course may not be used against a defendant at trial, but it is not until their use in a criminal case that a violation of the Self-Incrimination Clause [in the Fifth Amendment] occurs[.]" (Internal citation omitted.)). However, even in a noncriminal case, it is error to compel testimony from a witness who has properly invoked the Fifth Amendment, unless the court grants use and derivative-use immunity to preclude its future use in a criminal case. *See Redwine v. Starboard, LLC*, 240 Or App 673, 682-83, 251 P3d 192 (2011) (the "[Fifth Amendment] privilege protects a person from being compelled to testify in any proceeding—including civil proceedings—when the answers may incriminate the person in a future criminal prosecution"). Neither party cites a specific evidentiary rule, but OEC 512(1) appears to apply. *See* OEC 512(1) ("Evidence of a statement or other disclosure of privileged matter is not

---

[2] Father's counsel objected to the first question on Fifth Amendment grounds, and the objection was overruled. Father then answered that question and three additional questions without ever personally invoking the Fifth Amendment. Father's counsel then renewed his objection, and it was sustained. *See Rodriguez*, 301 Or App at 412 ("[B]arring exceptional circumstances, the only way a person can assert the privilege [against self-incrimination] is on a question-by-question basis.").

admissible against the holder of the privilege if the disclosure was * * * [c]ompelled erroneously[.]"). In any event, we agree with the state that any error in compelling father to testify in this proceeding was evidentiary in nature.

It follows that our harmlessness analysis is the same as for other evidentiary errors. That is, we must assess the likelihood that admitting the evidence, rather than excluding it, affected the outcome of the dependency jurisdictional trial. An evidentiary error is "harmless" if there is "little likelihood" that it affected the outcome. *Dept. of Human Services v. G. D. W.*, 353 Or 25, 39, 292 P3d 548 (2012) (internal quotation marks omitted). Having reviewed the record, we agree with the state that there is little likelihood that father's answers to the four questions at issue had any effect on the outcome of the jurisdictional trial. The juvenile court expressly discredited father's testimony and relied entirely on other evidence to make the findings regarding M. Moreover, before trial, father had already made inconsistent statements about whether M was stillborn or alive at birth, including to the detective who testified at the jurisdictional hearing. His answers to the four questions—which focused on asserting that M was stillborn—were largely cumulative of other evidence establishing prior statements by father about M being stillborn. Father does not proffer any theory by which the error was not harmless. *See State v. Jones*, 296 Or App 553, 570-71, 439 P3d 485, *rev den*, 365 Or 557 (2019) ("It is defendant's burden, as the party seeking reversal based on a claim of evidentiary error, to show some likelihood that the challenged evidence affected the verdict." (Internal quotation marks omitted.)).

We therefore conclude that any error by the juvenile court in compelling father to answer the four questions about M was harmless for purposes of the juvenile dependency proceeding, and we affirm the dependency judgments.[3]

---

[3] Of course, the Fifth Amendment is concerned with criminal trials, so the real "harm" would be the use of compelled testimony in a criminal trial against him. That potential harm cannot be addressed in this appeal because, even if we were to reverse the dependency jurisdictional basis relating to M's death, it would not change the record that has already been made. It can be avoided only through suppression in any criminal prosecution relating to M. *See Lefkowitz v. Turley*, 414 US 70, 78, 94 S Ct 316, 38 L Ed 2d 274 (1973) (discussing the inadmissibility of improperly compelled testimony "in a later criminal prosecution"); *Garrity*

Affirmed.

_____

*v. New Jersey*, 385 US 493, 500, 87 S Ct 616, 17 L Ed 2d 562 (1967) (holding that the defendant's compelled statements from a prior proceeding could not be used against him in criminal proceedings); *see also Chavez v. Robinson*, 12 F 4th 978, 994 (9th Cir 2021) (observing, in *dictum*, that if the defendant "had asserted his Fifth Amendment rights and then made the admissions required by his sex offender treatment program, the exclusionary rule" would require suppression in a later criminal trial).