Argued and submitted March 12, reversed and remanded April 21, 2010

In the Matter of R. C.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

K. L. R.,
*Appellant.*

Clackamas County Circuit Court
090415J;
Petition Number 090415J01;
A143609

230 P3d 49

Angela Sherbo argued the cause and filed the briefs for appellant.

Inge D. Wells argued the cause for respondent. On the brief were John R. Kroger, Attorney General, Jerome Lidz, Solicitor General, and Anna M. Joyce, Assistant Attorney General, filed the brief for respondent.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Armstrong, Judge.

BREWER, C. J.

## BREWER, C. J.

In this juvenile dependency case, mother appeals from a dispositional order that included a requirement that she and father each complete a polygraph test. The juvenile court imposed that requirement in order to determine whether mother or father caused unexplained injuries to their three-month-old child or knew the source of those injuries. Mother renews on appeal her assertion before the juvenile court that the polygraph requirement violated her rights against self-incrimination.[1] We reverse and remand.

Mother and father stipulated to juvenile dependency jurisdiction in this case, which, tragically, involved multiple unexplained injuries to their infant son that appear to have been inflicted over a period of time. As part of the dispositional order, the juvenile court, at the request of the child's attorney, imposed a provision requiring each parent to complete a polygraph test. The state did not join in that request. The record of the hearing shows that the purpose of the test was to determine if the parents caused the child's injuries or, if not, whether they knew what or who caused the injuries. Mother's attorney objected on the ground that the polygraph requirement violated her right not to incriminate herself. The trial court nonetheless imposed the requirement, observing that, "if [the parents are] asked a question by the polygraph examiner, 'Do you know how this occurred?' [a]nd they remain silent, then I guess the inference is whatever it is that the Court can draw or the polygraph examiner can draw." The court and the attorneys present at the hearing, including a deputy district attorney, discussed the possibility of providing immunity from prosecution to the parents for any incriminating statements that they might make during the course of the polygraph examination, but no such immunity was granted at the hearing or provided for in the disposition order.

Neither child nor father has appeared on appeal. The state has appeared on appeal; it principally asserts— quite cogently—that mother's arguments on appeal, except

---

[1] Mother raises additional arguments on appeal that were not preserved before the juvenile court. Except as noted below, we decline to address those arguments.

for her self-incrimination argument, were not preserved before the juvenile court. However, the state does not take a position on the merits with respect to mother's self-incrimination argument. At oral argument, we asked the parties to address whether mother's assertion of her rights against self-incrimination is unripe, because (1) she has not yet refused to submit to a polygraph examination or refused to answer any particular polygraph questions, or (2) the juvenile court has not yet penalized her in any way for a refusal.

■■ We first, albeit briefly, address the question of ripeness. A controversy is ripe if it involves present facts, as opposed to future events of a hypothetical nature. *McIntire v. Forbes*, 322 Or 426, 434, 909 P2d 846 (1996). Ripeness is one aspect of justiciability and, for that reason, a constitutional prerequisite for adjudication. *Yancy v. Shatzer*, 337 Or 345, 349, 97 P3d 1161 (2004). In *State ex rel Juv. Dept. v. Black*, 101 Or App 626, 792 P2d 1225 (1990), the father appealed from a dispositional order in a juvenile dependency case, challenging a provision in the order that required him to participate in an incest treatment program and provided that he should have no visitation with his child until he completed the program.

The father appealed, arguing that the treatment provision violated his rights against self-incrimination. We summarized the record as follows:

> "[The father] failed to adduce a scintilla of evidence that any incest treatment program required an admission of guilt, let alone that all treatment programs require it or that he has tried unsuccessfully to obtain treatment that would not require it. Participants in the hearing suggested in argument that some treatment programs do not require admission of guilt.
>
> "There also is no evidence that [Children's Services Division] required father to complete a particular program that demands an admission, that he failed to do so, or that CSD *disapproved* of father's participation in a particular treatment program that would satisfy his concerns."

*Black*, 101 Or App at 629 (emphasis in original). We concluded that the father's challenge was unripe:

"The juvenile court's only *ruling* was to continue the *status quo*. Although the court referred to balancing father's right not to incriminate himself against the child's best interests, it did not in fact do that, because it did not order him to do anything that might incriminate himself. Father's claim that the continuing requirement of treatment amounts to a requirement that he admit to the abuse fails for lack of proof, and the legal issues that he raises are not ripe for decision."

*Id.* at 631 (emphasis in original).

■ This case presents materially different circumstances. Here, the juvenile court ordered mother to complete a polygraph examination, the stated purpose of which was to ask mother whether she had injured the child or knew who did. The answers to those questions could expose mother to criminal liability. Moreover, the court stated that, if mother refused to complete the polygraph, the court could draw an inference adverse to mother's parental interests. In addition, the court persisted in its decision despite mother's attorney's assertion that mother would assert her rights against self-incrimination if ordered to complete a polygraph examination. In short, there was nothing hypothetical about mother's predicament. The court's order put her to the Hobson's choice of waiving her rights against self-incrimination or suffering adverse consequences in her quest to preserve her parental rights. It follows that her appeal is ripe. Accordingly, we turn to the merits.

■ Although mother asserts that the court's order violated her rights under Article I, section 12, of the Oregon Constitution, as well as the Fifth Amendment to the United States Constitution, she has not developed a separate analysis under the Oregon Constitution. Accordingly, we, like the parties, focus on mother's argument under the Fifth Amendment. The Fifth Amendment provides, in part, that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself[.]" The privilege can be claimed in any type of proceeding, but it protects a person from self-incrimination only in criminal prosecutions. The United States Supreme Court has held that the privilege to be free from self-incrimination may be asserted in "any proceeding, civil or criminal, administrative or judicial, investigatory or

adjudicatory; and it protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States*, 406 US 441, 444-45, 92 S Ct 1653, 32 L Ed 2d 212 (1972) (footnote omitted). It protects not only statements that could be directly incriminating, but also protects testimony that "would furnish a link in the chain of evidence needed to prosecute the * * * crime." *Hoffman v. United States*, 341 US 479, 486, 71 S Ct 814, 95 L Ed 1118 (1951). The standard for determining whether the privilege applies is "whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination." *Marchetti v. United States*, 390 US 39, 53, 88 S Ct 697, 19 L Ed 2d 889 (1968). No Oregon appellate decision has addressed the issue before us. However, the Fifth Amendment jurisprudence of other state appellate courts is instructive.

In *In re Amanda W.*, 124 Ohio App 3d 136, 705 NE2d 724 (1997) (*Armanda W.*), and *In re J.A., Juvenile*, 166 Vt 625, 699 A2d 30 (1997) (*J.A.*), the courts held that requiring an admission of abuse in a dependency proceeding as a condition of family reunification violates a parent's Fifth Amendment rights. In *Amanda W.*, the parents argued that a case plan requiring a parent to admit to sexually abusing his child in order to be reunited with that child violated the Fifth Amendment. The court agreed, concluding that a stepfather's admission to sexual abuse made in order to attend mandated group counseling for sex offenders would provide the basis for his criminal prosecution, and the mother's statements concerning the stepfather's culpability would create the potential for criminal charges against her for child endangerment. 124 Ohio App 3d at 141, 705 NE2d at 727. The court held that an "implicit, and potent, penalty for failure to satisfy the requirements of a particular case plan is the loss of a parent's fundamental liberty right to the care, custody, and management of his or her child." *Id.*

In *J.A.*, the Vermont Supreme Court held that a juvenile court cannot specifically require parents to admit criminal misconduct in order to reunite the family, because such a requirement violates the Fifth Amendment right against self-incrimination. 166 Vt at 626, 699 A2d at 31; *see*

*also In re Ariel G.*, 383 Md 240, 245-47, 858 A2d 1007 (2004) (holding that a mother was entitled under the privilege to refuse to answer the juvenile court's inquiries about the location of her son). In *J.A.*, the court explained the implications of the privilege against self-incrimination in child dependency proceedings:

> "We have held that '[t]he trial court cannot specifically require the parents to admit criminal misconduct in order to reunite the family.' * * * We have also recognized, however, the importance of preventing a child from being subjected to an abusive environment and thus have held that reunification plans may require extensive therapy and counseling for sexually abusive parents. Furthermore, if the parents' denial of abuse interferes with effective therapy, then the court 'may act on that finding to the parents' detriment without offending the Fifth Amendment privilege.' Therefore, the additional requirement that the stepfather successfully complete counseling was valid and appropriate."

166 Vt at 626, 699 A2d at 31 (internal citations omitted). Similarly, the Nebraska Court of Appeals has observed:

> "A review of the authority in other states indicates that there is a very fine, although very important, distinction between terminating parental rights based specifically upon a refusal to waive protections against self-incrimination and terminating parental rights based upon a parent's failure to comply with an order to obtain meaningful therapy or rehabilitation, perhaps in part because a parent's failure to acknowledge past wrongdoing inhibits meaningful therapy. The latter is constitutionally permissible; the former is not."

*In re Interest of Clifford M.*, 6 Neb App 754, 765, 577 NW2d 547 (1998).

The Minnesota Supreme Court addressed a similar issue in *Matter of Welfare of J.W.*, 415 NW2d 879 (Minn 1987), where the juvenile court had ordered psychological therapy to include an explanation of the death of a child. The prosecutor had indicated that refusal to cooperate would result in the filing of a termination petition with respect to the parents' other children. On appeal, the court concluded that, although the juvenile court could not directly require

the parents to incriminate themselves in therapy, the court could require them to engage in therapy generally. If the therapy was thereafter deemed to be ineffective, termination could proceed. The court explained:

> "What the parents would like to claim, although of course they cannot, is that their responsibility for the death of a child and the inferences arising therefrom is privileged and may not be considered in determining their suitability as parents. But to state this proposition is to refute it. Not only does the proposition ignore the fact that the evidence of responsibility has already been received but it ignores the best interests of the children."

*Id.* at 884. The court reasoned:

> "In the lexicon of the Fifth Amendment, the risk of losing the children for failure to undergo meaningful therapy is neither a 'threat' nor a 'penalty' imposed by the state. It is simply a consequence of the reality that it is unsafe for children to be with parents who are abusive and violent."

*Id.*

Likewise, in *Div. of Youth & Family Services v. S.S.*, 275 NJ Super 173, 177, 645 A2d 1213, 1216 (1994), the court held that requiring a mother to rebut *prima facie* evidence of abuse did not violate her Fifth Amendment privilege against self-incrimination. The court relied on *In re S.*, 66 Misc 2d 683, 690, 322 NYS2d 170, 177-78 (1971):

> "There is no mandatory requirement that they take the stand and testify. That would be unconstitutional. The constraint upon respondent to give testimony arises here simply from the force of circumstances and not from any form of compulsion forbidden by the Constitution.
>
> "* * * * *
>
> "* * * It may be a difficult decision for the respondents and their attorneys. [But i]t is a question of procedure and legal options for the defense, not one of the constitutionality of incrimination."

(Citation omitted.)

■ In examining possible accommodations for a parent's Fifth Amendment rights, continuing a dependency proceeding until after the conclusion of a criminal case is not palatable for the obvious reason that prompt disposition of child dependency proceedings is essential. *See generally* Jessica Wilen Berg, *Give Me Liberty or Give Me Silence: Taking a Stand on Fifth Amendment Implications for Court-Ordered Therapy Programs*, 79 Cornell L Rev 700 (1994); William Wesley Patton, *The World Where Parallel Lines Converge: The Privilege Against Self-Incrimination in Concurrent Civil and Criminal Child Abuse Proceedings*, 24 Ga L Rev 473 (1990). However, there can be a practical solution to the problem. Generally speaking, if a person is granted properly framed use immunity from criminal prosecution, he or she may be compelled to provide evidence in a dependency proceeding. *See In re Mark A.*, 156 Cal App 4th 1124, 1134, 68 Cal Rptr 3d 106, 112 (2007) ("[P]rotection against derivative as well as direct use of testimony would seem to be necessary to obtain that testimony over a claim of Fifth Amendment privilege." (Internal quotation marks omitted.)); *In re Ariel G.*, 383 Md at 255, 858 A2d at 1015 ("Once a recalcitrant parent is granted use immunity, the threat of using his or her statement against that person is lifted and the parent must testify or face contempt of court charges."); *see also* Patton, 24 Ga L Rev at 521-22.

 That conclusion is consistent with the jurisprudence of the United States Supreme Court. In *Kastigar*, the Court considered immunity under 18 USC section 6002:

> "The statute provides that when a witness is compelled by district court order to testify over a claim of the privilege: 'the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.'"

*Kastigar*, 406 US at 448-49. The Court concluded:

> "The statute's explicit proscription of the use in any criminal case of 'testimony or other information compelled under

the order (or any information directly or indirectly derived from such testimony or other information)' is consonant with Fifth Amendment standards. We hold that such immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege. While a grant of immunity must afford protection commensurate with that afforded by the privilege, it need not be broader."

*Id.* at 453. In short, a properly crafted grant of immunity may ease the friction between the Fifth Amendment right of a parent or caretaker to avoid self-incrimination and the state's authority to advance the best interests of a dependent and at-risk child.

 To summarize: (1) requiring an admission of abuse as a condition of family reunification violates a parent's Fifth Amendment rights; (2) on the other hand, terminating or limiting parental rights based on a parent's failure to comply with an order to obtain meaningful therapy or rehabilitation, perhaps in part because a parent's failure to acknowledge past wrongdoing inhibits meaningful therapy, may not violate the Fifth Amendment; and (3) providing use immunity from criminal prosecution is a necessary condition to compelling potentially incriminating statements as an inducement for full cooperation and disclosure during dependency proceedings. We now apply those principles to the circumstances of this case.

 There are two difficulties here. First, although the court and the parties discussed the advisability of providing mother with immunity from criminal prosecution as a condition of completing a polygraph examination, the court never made such a provision. Second, the polygraph requirement was not made part of a suite of treatment, training, or services for mother that was designed to correct the circumstances that resulted in wardship or to prepare mother to resume the care of the child, but, rather, it was separately imposed to determine the cause of the child's injuries.[2] Thus,

---

[2] ORS 419B.343(2) provides, in part:

"Except in cases when the plan is something other than to reunify the family, the department shall include in the case plan:

even if the court had statutory authority to impose a polygraph requirement as part of an appropriate course of treatment, training, or services,[3] the imposition of such a requirement on the record in this case ran afoul of mother's Fifth Amendment right to avoid self-incrimination. It follows that the juvenile court erred in imposing the polygraph requirement.

Reversed and remanded.

---

"(a) Appropriate services to allow the parent the opportunity to adjust the parent's circumstances, conduct or conditions to make it possible for the ward to safely return home within a reasonable time[.]"

ORS 419B.387 provides:

"If the court finds in an evidentiary hearing that treatment or training is needed by a parent to correct the circumstances that resulted in wardship or to prepare the parent to resume the care of the ward, the court may order the parent to participate in the treatment or training if the participation is in the ward's best interests."

[3] Mother asserts for the first time on appeal that the juvenile court lacked statutory authority to impose the polygraph requirement. Because mother did not preserve that argument before the juvenile court in the disposition hearing, we decline to address it in this appeal, except to note that, unless a polygraph examination is a permitted aspect of treatment, training, or services under ORS 419B.343, ORS 419B.387, or some other statutory source of authority, it is not readily apparent how, under the Fifth Amendment jurisprudence discussed above, mother could be required to comply with such a requirement.