Submitted January 14, 2013, affirmed December 31, 2014

Tami SAWYER,
*Petitioner,*

*v.*

REAL ESTATE AGENCY,
*Respondent.*

Real Estate Agency
200812652, 200812681; A149673

342 P3d 104

Mark D. Blackman and Ransom Blackman LLP filed the briefs for petitioner.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Cecil A. Reniche-Smith, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Hadlock, Judge, and Egan, Judge.

ARMSTRONG, P. J.

**ARMSTRONG, P. J.**

The Real Estate Agency issued a final order revoking petitioner's real estate license based on her involvement in two real estate matters, referred to as the McDonald/ Whitney transaction and the Middleton transactions. The agency concluded in its final order that petitioner had violated ORS 696.805(3)(a) in the McDonald/Whitney transaction and had violated ORS 696.805(3)(a), (b), (c), and (d), and OAR 863-015-0145(1) in the Middleton transactions.[1] Petitioner seeks judicial review of the agency's order, raising four assignments of error. First, she contends that the administrative law judge (ALJ) erred in denying her motion to stay the proceedings or, in the alternative, to grant her use immunity, in light of criminal charges then pending against her in federal court. In her second and third assignments of error, she challenges the merits of the agency's conclusions that her conduct violated the specified statutory and rule provisions. In her fourth assignment of error, she contends that the agency erred in imposing revocation of her license as a sanction for her conduct because her license had expired during the pendency of the proceedings. We reject petitioner's second and third assignments of error without discussion. For the reasons explained below, we also reject her first and fourth assignments of error. Accordingly, we affirm.

## I.   BACKGROUND

We begin by describing the pertinent facts with respect to each transaction; because petitioner does not dispute the agency's findings of fact, we state the facts consistently with the agency's final order. We then describe the proceedings below.

A.   *The McDonald/Whitney Transaction*

In January 2008, the McDonalds listed their Bend, Oregon, home for sale, with petitioner as the listing agent.[2] Petitioner showed the home to Whitney, whom petitioner also represented, in May of that year. The McDonalds signed

---

[1] The relevant statutes and rule are set out below. 268 Or App at 48 n 3.

[2] At the time, petitioner was licensed by the agency to conduct professional real estate activity.

a disclosure form consenting to the dual representation, though they were not aware that petitioner had a personal relationship with Whitney and had known her for several years.

On July 31, 2008, Whitney made an offer to purchase the McDonalds' home for $585,000, with an earnest money deposit of $1,000 and a closing date of October 25, 2008. In preparing the Residential Real Estate Sale Agreement, petitioner checked a box acknowledging receipt of a check for the earnest money, although petitioner had not actually received a check from Whitney. Along with the agreement, she also presented to the McDonalds a separate document entitled "Promissory Note for Earnest Money," signed by Whitney, in which Whitney promised to pay the $1,000 earnest money 10 days after mutual acceptance of the offer.

On August 1, 2008, the McDonalds rejected Whitney's offer and submitted a counteroffer for $610,000, with an earnest money deposit of $2,500. Whitney accepted and signed the counteroffer on August 5, 2008. Petitioner did not require Whitney to execute a new promissory note or otherwise set a deadline for payment of the increased earnest money. By check dated August 25, 2008, Whitney paid the earnest money amount of $2,500, and it was deposited into a client trust account. In September, Whitney decided not to proceed with the purchase and sought a refund of her earnest money; the McDonalds did not agree to release the earnest money. After negotiations with petitioner's principal broker, Whitney agreed to surrender the earnest money, and it was paid to the McDonalds on November 6.

B. *The Middleton Transactions*

On October 16, 2006, Thomas Middleton executed a durable power of attorney (POA), appointing petitioner, his friend of approximately 20 years, as his agent and attorney-in-fact. On the same date, Middleton instructed his attorney, Albertazzi, to hold the POA until Middleton requested that it be provided to petitioner or until Middleton became incapacitated or incompetent.

In 2008, petitioner operated three separate business entities—Tami Sawyer PC for her real estate activities; Starboard LLC, a real estate investment company; and Genesis Futures, LLC, a property-management company. Due to the declining real estate market at that time, all three businesses "were experiencing significant financial stress and had difficulty making payments to creditors"; Starboard LLC, for example, owed more than $2,000,000 to four investors. As of January 1, 2008, Middleton had invested $250,000 in Starboard LLC.

On March 5, 2008, Middleton instructed Albertazzi to deliver the POA to petitioner. On the same date, he established the Thomas S. Middleton Revocable Living Trust (the trust), naming himself as trustee and appointing petitioner successor trustee in the event of Middleton's resignation, death, or incapacity. The trust required the trustee to sell Middleton's personal residence following his death, and the proceeds were to be added to the corpus of the trust. Petitioner's three adult sons were among the beneficiaries of the trust. On July 15, Middleton amended the trust to give the trustee the discretion to rent or sell his residence based on market conditions; he also changed some of the details regarding the distribution of the trust after his death.

On July 20, 2008, Middleton provided Albertazzi with final instructions—signed by petitioner as "[POA] for Thomas S. Middleton"—stating that he had decided to give the spa at his residence to petitioner "because my house is going to be a rental until the real estate market improves. The idea is to eliminate all liability due to injury or accidental drowning from the spa."

Middleton died two days later, on July 22, 2008. On that morning, petitioner told Maunder, an employee of Genesis Futures, LLC, that Middleton wanted to know the rental value of his home. Maunder evaluated the home on July 22 or 23 and told petitioner that she could rent it for $995 per month. The next morning, another of petitioner's employees asked Maunder for the keys to the house because petitioner had decided to sell it rather than rent it. Petitioner listed the house for sale on July 24, with her company, Tami Sawyer PC, as the listing agent.

On September 4, an offer was accepted for the purchase of Middleton's home. Neither the Residential Real Estate Sale Agreement nor the real estate listing disclosed that petitioner was acting as a principal in the transaction in her capacity as successor trustee. In response to an e-mail note from one of Middleton's sons in early October asking about the house, petitioner told him that she had received an offer on the house and that the sale was likely to close within the week. She told another of Middleton's sons that she had tried to rent the home but "had not one call" and decided to sell it.

Petitioner, her husband, and her businesses had outstanding obligations of more than $150,000 due in September and October 2008. Petitioner told employees that the debts would be paid following the sale of Middleton's home.

On October 8, petitioner hired a company to move the spa from Middleton's home to petitioner's residence. The $550 cost to move the spa was eventually paid from the proceeds of the sale of Middleton's home; Middleton's estate was never reimbursed for that cost.

On October 9, petitioner, in her capacity as trustee of the Middleton trust, signed a statutory warranty deed conveying Middleton's home for $219,900; after deducting certain costs associated with the sale, including the costs of moving the spa, the escrow officer issued a check for $202,077.06, payable to petitioner as successor trustee of the trust. Petitioner received a commission of $4,464.85.

On October 10, Starboard LLC received a bank deposit of $202,077.06; before that deposit, the balance on the Starboard LLC account was $86.80. Also on that date, $70,000 was transferred from the Starboard LLC account to an account held by Genesis Future, LLC, and $20,000 was transferred from the Starboard LLC account to one held by Tami Sawyer PC.

A "Successor Trustee's Inventory Report" for the trust, prepared by petitioner on November 26, 2008, stated

that, at the time of Middleton's death, the trust had an investment with Starboard LLC valued at $250,000. The report also stated that the trust had invested an additional $150,000 in Starboard LLC from the proceeds of the sale of Middleton's home. It also listed $52,568 as an additional asset of the trust, but did not indicate where those funds were held. The value of the trust bank account was listed as $4,563.04 on the date of Middleton's death.

C. *Agency Proceedings*

On December 17, 2009, the agency issued notice to petitioner that it intended to revoke her real estate license based on her conduct in the McDonald/Whitney and Middleton transactions. Petitioner had been licensed by the agency since at least 1995, and her then-current license was set to expire on April 30, 2010.

In connection with the McDonald/Whitney transaction, the notice alleged that petitioner had failed to account for earnest money in a timely manner, in violation of ORS 696.805(3)(a) and (b), ORS 696.810(3)(a) and (b), and ORS 696.815(2), and had violated ORS 696.805(3)(a) and ORS 696.810(3)(a) when she had marked the box in the agreement indicating that she had received a "check" for the earnest money deposit.

Based on petitioner's conduct in the Middleton transactions, the notice alleged that petitioner (1) had violated ORS 696.805(3)(a), (c), and (d) by removing the spa from Middleton's residence for her personal use, contrary to Middleton's instructions that it be removed only while the house was held as a rental; (2) had violated ORS 696.805(3)(a), (c), and (d) by selling Middleton's home contrary to instructions that it was to be held as a rental property until market conditions improved; (3) had failed to provide written disclosure "that she was acting as a principal in her capacity as a successor trustee" in violation of OAR 863-015-0145(1); (4) had failed to account for over $52,000 in proceeds from the sale of the Middleton home in violation of ORS 696.805(3)(a) and (b) and ORS 696.815(2); and (5) had used proceeds from the sale of the Middleton home to pay for personal bills and debts of Starboard LLC,

Genesis Futures, LLC, and Tami Sawyer PC in violation of ORS 696.805(3)(a), (b), and (c) and ORS 696.815(2). [3]

The notice alleged that petitioner was subject to discipline under various provisions of ORS 696.301[4] for

---

[3] As pertinent here, ORS 696.805(3) provides that a seller's agent owes the seller involved in a real estate transaction the affirmative duty to "exercise reasonable care and diligence"; "account in a timely manner for money and property received from or on behalf of the seller"; "be loyal to the seller by not taking action that is adverse or detrimental to the seller's interest in a transaction"; and "disclose in a timely manner to the seller any conflict of interest, existing or contemplated." ORS 696.805(3)(a), (b), (c), (d). Similarly, ORS 696.810(3) provides that a buyer's agent owes the buyer involved in a real estate transaction the affirmative duty to "exercise reasonable care and diligence" and to "account in a timely manner for money and property received from or on behalf of the buyer." ORS 696.810(3)(a), (b). OAR 863-015-0145(1) provides:

"If a real estate licensee, whether active or inactive, either directly or indirectly offers or negotiates for the sale, exchange, lease option, or purchase of real estate and the licensee is a principal to the transaction, the licensee must disclose to the other party to the offer or transaction that the licensee is a real estate licensee. The licensee must make the disclosure in any advertising or display signs, and it must appear in writing on at least the first written document of agreement concerning the offer or transaction. The disclosure set forth on the agreement document also must state that the real estate licensee is representing himself or herself as either the buyer or the seller in the transaction."

Finally, ORS 696.815(2) provides:

"A real estate licensee acting pursuant to a disclosed limited agency agreement [under which a licensee may represent both the seller and the buyer in a real estate transaction with full disclosure of the relationship, ORS 696.815(1)] has the following duties and obligations:

"(a) To the seller, the duties under ORS 696.805;

"(b) To the buyer, the duties under ORS 696.810; and

"(c) To both seller and buyer, except with express written permission of the respective person, the duty not to disclose to the other person [certain specified information]."

[4] As relevant, ORS 696.301 provides:

"Subject to ORS 696.396 [relating to rules for progressive discipline and investigation of complaints], the Real Estate Commissioner may suspend or revoke the real estate license of any real estate licensee, reprimand any licensee or deny the issuance or renewal of a license to an applicant who has done any of the following:

"* * * * *

"(3) Disregarded or violated any provision of ORS 659A.421, 696.010 to 696.495, 696.600 to 696.785 and 696.800 to 696.870 or any rule of the Real Estate Agency.

"* * * * *

"(5) Acted as an agent and an undisclosed principal in any transaction.

"* * * * *

her conduct in the two matters. Petitioner requested a hearing, the agency referred the hearing request to the Office of Administrative Hearings (OAH), and an ALJ was assigned. Between the time that the notice of revocation was issued and the hearing was held, two events occurred: (1) on October 21, 2010, petitioner was indicted in federal district court for conspiracy to commit wire fraud, wire fraud, bank fraud, false statement to financial institution, and money laundering; and (2) petitioner's real estate license expired.

On October 29, 2010, petitioner moved to dismiss the administrative proceeding on the ground that the agency lacked jurisdiction over her because her real estate license had expired on April 30, 2010. She also moved to stay the proceeding or, in the alternative, to grant use immunity to her on the ground that there was a factually related federal criminal case pending against her. With regard to that motion, she stated, in part, that

> "[a] comparison of the Notice [in the agency proceeding] and the Indictment [in the federal criminal proceeding] demonstrates that the two proceedings arise out of a common set of facts, are factually related, that [petitioner] has a good faith need and basis to assert the privilege against self-incrimination in this proceeding, and that absent an opportunity to participate in this proceeding, would be denied a full and fair hearing as required by ORS 183.415(10) [*sic*] and the Oregon and United States constitutions."

At the start of the hearing on November 3, 2010, the ALJ, after extended discussion, denied both motions, concluding that, unlike a circuit court, he had no authority to grant use immunity, and, regarding the motion to stay, that there was "a public interest in moving forward with the case." The ALJ ruled that the case "would go forward

---

"(12) Demonstrated incompetence or untrustworthiness in performing any act for which the licensee is required to hold a license.

"*****

"(14) Committed an act of fraud or engaged in dishonest conduct substantially related to the fitness of the applicant or licensee to conduct professional real estate activity, without regard to whether the act or conduct occurred in the course of professional real estate activity."

\* \* \* with the understanding that [petitioner] has the right to assert her 5th Amendment rights not to testify."

The evidentiary portion of the hearing then began. The agency called petitioner, and petitioner invoked her privilege against self-incrimination under the state and federal constitutions in response to the agency's questions. The ALJ heard other evidence, and the parties filed written closing arguments. Subsequently, the ALJ issued a proposed order concluding that petitioner had committed all of the violations alleged by the agency, except it concluded that petitioner "did not fail to account to a seller for earnest money" in the McDonald/Whitney transaction, as had been alleged by the agency. The ALJ also concluded, however, that, although the agency had jurisdiction to discipline petitioner under ORS 696.775, it had no "power to revoke a license [that] does not exist." Nor could it deny the issuance or renewal of a license in the absence of an application for one. Thus, the ALJ concluded, the only discipline available under the circumstances was a formal reprimand, and that is what the ALJ proposed.

The agency issued an amended proposed order largely adopting the findings and conclusions of the ALJ, with one notable exception: The agency concluded that, under ORS 696.775 and ORS 696.301, it retained authority to revoke petitioner's license. Accordingly, it rejected the ALJ's recommended sanction and ordered that "the license that formed the basis of the present case is revoked due to [petitioner's] repeated and serious violations of ORS 696.805(3) and OAR 863-015-0145(1)." Petitioner did not file exceptions to the amended proposed order, and it became final.

## II. ANALYSIS

A. *Denial of Motion to Stay Proceedings or Grant Use Immunity*

In her first assignment of error, petitioner contends that the ALJ erred in denying her motion to stay the proceedings or, in the alternative, to grant use immunity to her in light of the criminal charges pending against her in federal court for conduct that, she contends, was "factually

related" to the allegations in the administrative action.[5] We consider each in turn.

### 1. Denial of Motion to Stay

In support of her argument that the ALJ erred in denying her motion for a stay, petitioner contends that she

"was entitled to a stay under both Article I, section 12, of the Oregon Constitution and the Fifth and Fourteenth Amendments to the United States Constitution. The ALJ's denial of a stay constituted a 'material error in procedure' that undermined the 'fairness of the proceedings' [quoting ORS 183.482(7)[6]] that warrants setting aside the [agency's] Final Order."

However, she does not explain how those sources of law— *viz.*, ORS 183.482(7); Article I, section 12; and the Fifth and Fourteenth Amendments—operate to support her contention that the ALJ erred by not staying the administrative proceedings. Instead, she cites a string of federal cases indicating that a trial court has discretion—as a matter of federal constitutional law—to stay civil proceedings in light of a pending criminal action concerning the same

---

[5] We note that the agency has filed a notice of probable mootness, informing us that petitioner has now entered guilty pleas to the federal charges and arguing that petitioner's first assignment of error is, therefore, moot. It reasons that, "[b]ecause there is no longer a pending federal prosecution, a reversal of the ALJ's rulings regarding petitioner's request for a stay or use immunity would have no practical effect on the parties." We fail to see how the assignment of error is moot; if the ALJ erred in failing to stay the administrative proceedings or to grant petitioner use immunity, as petitioner contends, then that error would result in a reversal of the final order revoking petitioner's license and a remand for a new hearing. Thus, our decision in the matter certainly "will have some practical effect on the rights of the parties." *Brumnett v. PSRB*, 315 Or 402, 405, 848 P2d 1194 (1993). If we decide in petitioner's favor, the fact that, *on remand*, petitioner may no longer need a stay or immunity does not obviate the ALJ's error, if any, in denying petitioner's motion to stay the proceedings or grant her immunity in the first place. The issue remains justiciable.

[6] ORS 183.482(7) provides, in part:

"The court shall remand the order for further agency action if the court finds that either the fairness of the proceedings or the correctness of the action may have been impaired by a material error in procedure or a failure to follow prescribed procedure, including a failure by the presiding officer to comply with the requirements of ORS 183.417(8)."

ORS 183.417(8) provides, in turn that "[t]he officer presiding at the hearing shall ensure that the record developed at the hearing shows a full and fair inquiry into the facts necessary for consideration of all issues properly before the presiding officer in the case and the correct application of the law to those facts."

conduct.[7] Accordingly, we focus our analysis on that theory and do not consider petitioner's undeveloped arguments under ORS 183.482(7) or the Oregon Constitution.[8] *See Redwine v. Starboard, LLC*, 240 Or App 673, 682, 251 P3d 192 (2011) (considering privilege against self-incrimination only under Fifth Amendment where parties did not develop a separate analysis under Article I, section 12).

Petitioner relies primarily on *Securities & Exchange Com'n v. Dresser Indus.*, 628 F2d 1368 (DC Cir), *cert den*, 449 US 993 (1980) (*Dresser*), as support for her argument. In that case, the Court of Appeals for the D. C. Circuit explained that, although "[t]he Constitution * * * does not ordinarily require a stay of civil proceedings pending the outcome of criminal proceedings, * * * a court may decide, in its discretion, to stay civil proceedings * * * 'when the interests of justice'" seem to require it. *Id.* at 1375 (quoting *United States v. Kordel*, 397 US 1, 12 n 27, 90 S Ct 763, 25 L Ed 2d 1 (1970)); *accord Keating v. Office of Thrift Supervision*, 45 F3d 322, 324 (9th Cir), *cert den*, 516 US 827 (1995). The D. C. Circuit further commented:

> "Other than where there is specific evidence of agency bad faith or malicious governmental tactics, the strongest case for deferring civil proceedings until after completion of criminal proceedings is where a party under indictment for a serious offense is required to defend a civil or administrative action involving the same matter. The noncriminal proceeding, if not deferred, might undermine the party's Fifth

---

[7] Petitioner does cite one Oregon case—*Dept. of Human Services v. K. L. R.*, 235 Or App 1, 230 P3d 49 (2010)—but only for its recognition of the application of the *Fifth Amendment* privilege; specifically, she argues that "forcing someone to waive privilege or forgo resistance to a significant non-criminal loss [there, parental rights] runs 'afoul of [her] Fifth Amendment right to avoid self-incrimination.'" (Quoting *K. L. R.*, 235 Or App at 11; brackets in petitioner's brief.)

[8] In her *reply* brief, petitioner contends that not granting the stay "undermined the ALJ's ability to fulfill his obligation under ORS 183.417(8) to 'ensure that the record developed at the hearing shows a full and fair inquiry into the facts necessary for consideration of all issues,'" citing *Berwick v. AFSD*, 74 Or App 460, 703 P2d 994, *rev den*, 300 Or 332 (1985), and *Dennis v. Employment Div.*, 302 Or 160, 168, 728 P2d 12 (1986). To the extent petitioner is thus arguing that ORS 183.417(8) provides an independent source for concluding that a stay was *required* as a matter of law in this case, the cases petitioner cites in support of the proposition are unavailing, and, in any event, the argument comes too late. *Clayton v. DAS*, 258 Or App 689, 691 n 2, 313 P3d 296 (2013).

Amendment privilege against self-incrimination, expand rights of criminal discovery beyond the limits of Federal Rule of Criminal Procedure 16(b), expose the basis of the defense to the prosecution in advance of criminal trial, or otherwise prejudice the case. If delay of the noncriminal proceeding would not seriously injure the public interest, a court may be justified in deferring it."

*Id.* at 1375-76 (footnotes and citations omitted). Citing two federal district court memorandum opinions, *Nowaczyk v. Matingas*, 146 FRD 169, 174 (ND Ill 1993), and *White v. Mapco Gas Products, Inc.*, 116 FRD 498, 502 (ED Ark 1987) (*Mapco Gas*), petitioner contends that the factors a court is to consider in deciding whether to grant a stay under *Dresser* are

"(1) whether the two actions involve the same subject matter; (2) whether the two actions are brought by the government; (3) the posture of the criminal proceeding: (4) the effect on the public interests at stake if a stay were to be issued; (5) the interest of the plaintiffs in proceeding expeditiously with this litigation and the potential prejudice to plaintiffs of a delay; and (6) the burden that any particular aspect of the proceedings may impose on defendants."

Beyond that, however, petitioner, in her opening brief, simply contends that she was "awaiting trial in federal court on allegations overlapping with those in the Notice of Intent to Revoke License" and that "[e]ach of the six factors favoring a stay identified in *Nowaczyk* and *Mapco Gas* were present." She provides no explanation as to *how* the allegations "overlap" such that they "involve the same subject matter"; nor does she provide any analysis of the other enumerated factors and how they apply in this case. That is insufficient to compel the conclusion that the ALJ was required to exercise his discretion to stay the administrative proceeding as petitioner asserts.

In other words, even assuming that the factors petitioner cites are dispositive in this context,[9] petitioner has

___

[9] The Ninth Circuit has formulated the factors slightly differently than petitioner does: In *Keating,* the court explained that "the decisonmaker should consider 'the extent to which a defendant's fifth amendment rights are implicated,'" 45 F3d at 324 (quoting *Federal Sav. & Loan Ins. Corp. v. Molinaro*, 889 F2d 899, 902 (9th Cir 1989)), as well as "(1) the interest of the plaintiffs in proceeding expeditiously with this litigation or any particular aspect of it, and the potential prejudice to plaintiffs of a delay; (2) the burden which any particular aspect of

not provided sufficient grounds from which we can conclude that the ALJ abused his discretion in denying a stay. It is not up to this court, for example, to scour the indictment in the federal criminal case to determine whether the two actions, indeed, involve the same subject matter. As the agency points out, "[t]he federal criminal charges were not related to either transaction [for which the agency sought to revoke petitioner's real estate license] but, rather, to petitioner's use of two companies—Starboard LLC and Starboard Indiana LLC—to defraud investors of more than $4.4 million"; thus, the overlap, if any, "is only that, before his death, Thomas Middleton had invested in petitioner's ventures, and petitioner used funds from the sale of the Middleton residence to pay debts incurred by those companies." That could well be the case; petitioner does not give us any reason to think otherwise. In short, it is not clear, without more, that even the first of the six factors on which petitioner relies weighs in favor of granting a stay in this case.

It is not until her reply brief that petitioner—for the first time—attempts any explanation as to the application of those factors to the circumstances of this case. Although, even then, she still does not articulate why the two proceedings are factually related in a legally significant way, she contends that, because of "one particular circumstance"—*viz.*, the fact "that Petitioner's [real estate] license had lapsed"—there was no need for the agency to proceed expeditiously, nor would the granting of a stay adversely affect the interests of nonparties or the public. Conversely, she contends, proceeding with the administrative action "imposed an enormous burden on Petitioner—it precluded her from presenting her side of the story—and resulted in an extremely inefficient use of judicial resources." However, even if we were to consider petitioner's argument, raised for the first time in reply, *but see, e.g., Clayton v. DAS*, 258 Or App 689, 691 n 2, 313 P3d 296 (2013) ("To the extent that plaintiff's argument was developed for the first time in his

the proceedings may impose on defendants; (3) the convenience of the court in the management of its cases, and the efficient use of judicial resources; (4) the interests of persons not parties to the civil litigation; and (5) the interest of the public in the pending civil and criminal litigation," *id.* at 325. Given our analysis and disposition of the issue, that discrepancy is of no importance.

reply brief, it is not properly before us on appeal."), it would not change our conclusion.

"'In the absence of substantial prejudice to the rights of the parties involved, [simultaneous] parallel [civil and criminal] proceedings are unobjectionable under our jurisprudence.'" *Keating*, 45 F3d at 324 (quoting *Dresser*, 628 F2d at 1374; brackets in *Keating*). "In deciding whether to proceed with the hearing, the extent to which the defendant's Fifth Amendment rights are implicated is a significant factor for the ALJ to consider, but it is only one consideration to be weighed against others." *Id.* at 326 (citation omitted). Here, the ALJ assessed the circumstances and concluded that a stay would not be in the public interest. The ALJ commented that "the federal courts move at a very glacial pace," and petitioner did not provide any potential timeline for resolution of the criminal proceedings. As the agency points out, it "has an interest in ensuring the timely resolution of charges against licensees, either to protect the public against unscrupulous licensees or to absolve innocent licensees of unfounded accusations." Moreover, there was no evidence that the civil proceedings were being used to circumvent the discovery rules in the criminal proceeding, *see Dresser*, 628 F2d at 1376, "would expose the basis of the defense to the prosecution in advance of the criminal trial," *id.*, or would otherwise prejudice petitioner's case. Finally, petitioner's right to a full and fair disciplinary hearing did not *depend* on her testimony. *See State v. Graf*, 316 Or 544, 550-52, 853 P2d 277 (1993) (recognizing that a party may obtain a full and fair hearing in a disciplinary proceeding without testifying). Petitioner's attorney was present at the hearing to make objections, cross-examine the agency's witnesses, and offer evidentiary exhibits on petitioner's behalf. In short, even considering petitioner's late-raised argument, petitioner has not demonstrated "substantial prejudice" to her rights by going forward with the administrative proceeding; accordingly, we cannot say that the ALJ abused his discretion by denying petitioner's motion to stay the proceedings. *See Keating*, 45 F3d at 326 ("A defendant has no absolute right not to be forced to choose between testifying in a civil matter and asserting his Fifth Amendment privilege." (Citing *Baxter v. Palmigiano*, 425 US 308, 318, 96 S Ct 1551, 47 L Ed 2d 810 (1976).)).

## 2. *Refusal to Grant Petitioner Use Immunity*

Petitioner argues, alternatively, that, if we reject her argument regarding the stay, we "should hold that [the ALJ] erred in denying her request for use immunity," relying entirely on *Dept. of Human Services v. K. L. R.*, 235 Or App 1, 230 P3d 49 (2010). We disagree.

In *K. L. R*, a juvenile dependency case, the mother appealed a dispositional order of the juvenile court requiring her and the child's father to complete polygraph examinations in an effort to determine if they had caused their child's unexplained injuries or if they knew the cause. 235 Or App at 3. The mother contended, as she had below, that the polygraph requirement violated her rights against self-incrimination under the Fifth Amendment. *Id.* at 5. Drawing on case law from other jurisdictions, we observed that, "[g]enerally speaking, if a person is granted properly framed use immunity from criminal prosecution, he or she may be compelled to provide evidence in a dependency proceeding." *Id.* at 9 (citations omitted). We held that the court in *K. L. R.* had erred in ordering the polygraph, in part, because it did not also provide the mother with immunity from criminal prosecution as a condition of her completing it. *Id.* at 10. Petitioner asserts that, similarly here, we should hold that the ALJ erred in "proceeding with the hearing without granting Petitioner properly framed use immunity." (Internal quotation marks omitted.)

The agency responds, first, that the ALJ had no authority to grant petitioner immunity because that authority derives solely from statute, citing *State v. White*, 96 Or App 713, 716, 773 P2d 824, *rev den*, 308 Or 382 (1989), and, to the extent *K. L. R.* can be read to suggest otherwise, it was wrongly decided. We need not address that issue because we agree with the agency's second argument, which is that petitioner's argument fails for the simple reason that, here, unlike in *K. L. R.*, petitioner was not *compelled* to testify within the meaning of the Fifth Amendment. *See Graf*, 316 Or at 550-52.

In *Graf*, the Supreme Court reversed our conclusion that the defendant—whose acts of misconduct formed the basis for termination of his employment as well as criminal

charges—was compelled to testify within the meaning of
the Fifth Amendment at his pre-termination hearing, and
thus was entitled to use immunity, because his "'failure to
appear and testify at the pre-termination hearing would
have resulted in defendant's being denied his right to a full
due process post-termination hearing at which he could
refute the charges and offer matters in mitigation.'" *Id.* at
550 (quoting *State v. Graf*, 114 Or App 275, 280, 835 P2d
934, *aff'd on other grounds*, 316 Or 544, 853 P2d 277 (1993)).
The Supreme Court concluded that the applicable adminis-
trative rule "exerted no compulsion on defendant to testify
at the pre-termination hearing." *Graf*, 316 Or at 552. The
court reasoned that the pre-termination hearing procedure
was noncoercive, in part, because

> "the employee need not testify personally to preserve any
> claims or defenses. The employee or the employee's lawyer
> or representative can attend, offer testimony, and make
> legal or equitable arguments. Co-workers or supervisors
> or others who have pertinent information can be called as
> witnesses. Other evidence can be offered. In many situa-
> tions a strong case for the employee can be made without
> having the employee testify personally. * * * Because the
> employee is not required to testify, and because the rule
> specifies that silence shall not constitute any admission of
> the charges, there is no compulsion to testify."

*Id.* at 551.

Petitioner essentially ignores the Supreme Court's
holding in *Graf*, and, without argument to the contrary, we
are not persuaded that the circumstances here are mean-
ingfully distinguishable. As noted, petitioner's attorney was
able to—and did—make arguments and offer evidence on
petitioner's behalf. Moreover, the agency had the burden
to prove the allegations against petitioner by a preponder-
ance of the evidence, *see* ORS 183.450(2); *Sobel v. Board of
Pharmacy*, 130 Or App 374, 379, 882 P2d 606 (1994), *rev den*,
320 Or 588 (1995); as in *Graf*, there is no indication that
petitioner's silence would constitute admission of the alle-
gations. In short, although to be sure, *Graf* is not entirely
on all-fours—after all, *Graf* involved a *pre*-termination
hearing—petitioner has not persuaded us that she was com-
pelled to testify within the meaning of the Fifth Amendment

because, without use immunity, she was "denied a meaningful opportunity to defend against the [agency's] allegations."

B. *Revocation of Real Estate License*

As noted, in her fourth assignment of error,[10] petitioner contends that the agency erred in revoking her real estate license, which had expired between the time that the notice issued and when the revocation hearing occurred. The agency reasoned that, because ORS 696.775 "specifically extends the Agency's jurisdiction to discipline a licensee whose license has expired[,] * * * the agency has jurisdiction to impose discipline in this case." And, because discipline under ORS 696.301 includes "revocation, suspension, reprimand, or the denial of the issuance or renewal of a license," the agency concluded that "revocation of the license that existed at the time the Notice was issued is an appropriate sanction and is within the Agency's discretion."

On review, petitioner challenges the agency's reasoning, contending that, "while ORS 696.775 authorizes the [agency] to proceed with a disciplinary proceeding [after a license has expired], it does not authorize the revocation of an expired license."[11] She contends that we should adopt the ALJ's analysis instead and "vacate" the agency's order revoking her license. Referencing *Schurman v. Bureau of Labor*, 36 Or App 841, 844, 585 P2d 758 (1978), and ORS 696.301, the ALJ reasoned as follows:

---

[10] We have previously rejected, without discussion, petitioner's second and third assignments of error. 268 Or App at 43.

[11] Petitioner also suggests that we should vacate the order of revocation based on what she characterizes as the agency lawyer's "judicial admission" that the agency lacks authority under Oregon law to revoke a license that does not exist. Suffice it to say that we agree with the agency that it is at least questionable whether the lawyer actually made such a concession, and, in any event, the principle of judicial admission relates to the establishment of facts, not legal conclusions. *See Great Seneca Financial Corp. v. Lisher*, 223 Or App 496, 500, 196 P3d 86 (2008) ("[A] judicial admission is a formal concession in pleadings or stipulations that withdraws a fact from issue, and is made for the purpose of dispensing with proof of a fact in issue." (Internal quotation marks, citations, and brackets omitted.)); *State v. Porter*, 202 Or App 622, 627, 123 P3d 325 (2005) (describing judicial admission as "a statement by which one party waives the right to require the other party to prove a particular fact"; the party "must knowingly make the statement for the purpose of dispensing with the need for proof" (citations omitted)). Accordingly, we reject that argument without further discussion.

"There is no evidence that [petitioner] applied to renew her license or that the license was valid after April 2010. Thus, there is no evidence that she holds a license which can be suspended or revoked. Furthermore, in the absence of an application, the Agency may not deny the issuance or renewal of a license. While the Agency established that [petitioner] committed serious violations that would support revocation, it may not revoke a license that does not exist. The only available form of discipline available under the circumstances of this case is a reprimand."

(Footnote omitted.)

The agency responds that petitioner's reliance on the ALJ's analysis, and "by extension," *Schurman*, is misplaced. Rather, according to the agency, this case is closer to *Grobovsky v. Board of Medical Examiners*, 213 Or App 136, 159 P3d 1245 (2007), in which the operative statute authorized the Board of Medical Examiners to suspend the petitioner's medical license, although the petitioner had allowed the license to expire. We conclude that the agency has the better argument.

ORS 696.775 provides:

"The lapsing, expiration, revocation or suspension of a real estate license, whether by operation of law, order of the Real Estate Commissioner or decision of a court of law, or the inactive status of the license or voluntary surrender of the license by the real estate licensee, does not deprive the commissioner of jurisdiction to:

"(1) Proceed with an investigation of the licensee;

"(2) *Conduct disciplinary proceedings relating to the licensee*;

"(3) *Take action against a licensee*, including assessment of a civil penalty against the licensee for a violation of ORS 696.020(2); or

"(4) Revise or render null and void an order suspending or revoking a license."

(Emphasis added.)

As noted, petitioner acknowledges that ORS 696.775 authorizes the agency to continue disciplinary proceedings against her notwithstanding that her license has expired;

however, petitioner disputes that it authorizes the agency to *revoke* her license as a result of that disciplinary proceeding, because her license no longer exists. Essentially, petitioner concludes—as did the ALJ—that revoking an expired license is logically impossible.

That position, of course, has some appeal. That is, how is it possible to revoke a person's license when the person no longer holds a license? However, by the same token, the legislature has authorized the agency to "investigat[e]," "[c]onduct disciplinary proceedings relating to," and "[t]ake action against" a *"licensee"* whose license has lapsed, expired, or been revoked or suspended, ORS 696.775(1), (2), (3) (emphasis added), which, under petitioner's theory, would be equally illogical. That is, if a "licensee's" license has expired, how can there be a "licensee"?[12] And, from the plain text of the statute, there can be no mistaking the legislature's intention to grant the agency jurisdiction to continue disciplinary proceedings against a person notwithstanding the "lapsing, expiration, revocation or suspension of" the person's license; the legislature took pains to delineate all of the means by which that might occur—operation of law, agency order, court decision, inactive status of the licensee, or voluntary surrender of the license. Thus, petitioner's argument is sensible but not dispositive.

Nor does *Schurman* assist petitioner. There, the Bureau of Labor revoked the petitioner's business license, and, as in this case, between the time of the notice of intent to revoke the petitioner's license and the revocation hearing, the petitioner's license had expired by operation of law. 36 Or App at 843-44. We held that the Bureau lacked authority to take such action with respect to a "non-existent license." *Id.* at 844. We stated, flatly, "Where no license exists, the

---

[12] Although the parties do not mention it, ORS 696.010(18) defines the term "'[r]eal estate licensee,'" to mean, *"unless the context requires otherwise,"* "an individual who holds an active license as a real estate broker, principal real estate broker or real estate property manager." (Emphasis added.) ORS 696.010 also defines the terms "expired," "inactive," "lapsed," and "nonlicensed individual," with the same caveat. "'Expired' means, in the context of a real estate licensee, that the license has not been renewed in a timely manner, but may still be renewed," ORS 696.010(6), whereas "'[l]apsed'" in that context means "that the license has not been renewed in a timely manner and is not eligible for renewal," ORS 696.010(8).

Bureau is without jurisdiction to act." *Id.* However, in *Schurman*, the statute under which the Bureau purported to act, ORS 658.115 (1977), did not, like ORS 696.775, grant the administrative body *any* continuing jurisdiction in the circumstance of an expired license.

In *Grobovsky*, we made clear that *Schurman* does not control where there is a statute authorizing the agency to impose discipline on a licensee or a former licensee. 213 Or App at 147-48. There, the operative statute, ORS 677.175(3), provided that "[t]he surrender, retirement or other forfeiture, expiration or cancellation of a license issued by the board shall not deprive the board of its authority to institute or continue a disciplinary action against the licensee *upon any ground provided by law*." (Emphasis added.) To be sure, ORS 696.775 is not as explicit as ORS 677.175(3); nonetheless, as we explain below, it leads to a conclusion similar to the one that we reached in *Grobovsky*—that is, that the board was not prohibited from suspending the petitioner's license, even though that license had expired.[13] 213 Or App at 147-48.

ORS 696.775 plainly allows the agency to "[c]onduct disciplinary proceedings" and "[t]ake action" against a licensee whose license has expired. Moreover, the legislature did not limit the "action" authorized by ORS 696.775 in any way. In context, "action" must be understood to mean disciplinary action, which necessarily leads us to ORS 696.301, the statute describing the disciplinary actions that the agency is authorized to take. And, ORS 696.301 expressly includes revocation among the list of authorized actions. As set out earlier, it provides that "the Real Estate Commissioner may suspend or *revoke the real estate license*

---

[13] Petitioner contends that *Grobovsky* is inapposite because the issue there was only whether the board had authority to discipline the petitioner at all, not the nature of the discipline available. We disagree. The order of which the petitioner sought review in *Grobovsky* was an order *suspending* the petitioner's medical license, which, because she did not renew it, had expired. 213 Or App at 138. The issue before us, therefore, was whether the board had authority to suspend the petitioner's license when she was no longer licensed in the state. In rejecting the petitioner's argument under *Schurman*, we necessarily held that the board had that authority. *Id.* at 147-48. We do not perceive a meaningful distinction between suspending an expired license and revoking one; accordingly *Grobovsky* is informative.

*of any real estate licensee*, reprimand any licensee or deny the issuance of renewal of a license to an applicant who has done any of [an enumerated list of violations]." (Emphasis added.) It follows that the agency did not err in revoking petitioner's license "that existed at the time the Notice was issued."

## III.  CONCLUSION

In sum, we conclude that the ALJ did not err in denying petitioner's motion to stay the proceedings or in failing to grant her use immunity. Nor did the agency err in determining that petitioner's conduct violated the statutes and rules as specified or in revoking her license. Accordingly, we affirm.

Affirmed.